## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| Southern Utah Wilderness Alliance, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:08-CV-02187-RMU |
| | ) | |
| Stephen Allred, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Fed.R.Civ.P. 65 and LCvR 65.1, Plaintiffs Southern Utah Wilderness Alliance *et al.* move this Court to issue preliminary relief to prevent imminent, irreparable harm—the sale of eighty leasing authorizing oil and gas development in some of the nation's most spectacular public lands.  Plaintiffs request the Court to enjoin Federal Defendants from issuing leases for the eighty parcels Plaintiffs have challenged in this matter.[1]  Bureau of Land Management (BLM), an agency of the Department of the Interior, authorized the sale of these leases in its Decision to Lease signed on December 12, 2008.  BLM proceeded with its scheduled oil and gas lease sale on December 19,

---

[1] The specific parcels as identified in Plaintiffs' Complaint are: UT1108-83, UT1108-84, UT1108-86, UT1108-87, UT1108-90, UT1108-91, UT1108-93, UT1108-94, UT1108-96, UT1108-97, UT1108-98, UT1108-101, UT1108-106, UT1108-109, UT1108-110, UT1108-111, UT1108-112, UT1108-115, UT1108-116, UT1108-136, UT1108-137, UT1108-159, UT1108-162, UT1108-163, UT1108-164, UT1108-166, UT1108-167, UT1108-168, UT1108-169, UT1108-170, UT1108-171,  UT1108-174, UT1108-175, UT1108-176, UT1108-177, UT1108-180, UT1108-181, UT1108-182, UT1108-183, UT1108-184, UT1108-185, UT1108-186, UT1108-187, UT1108-196, UT1108-197, UT1108-201, UT1108-202, UT1108-203, UT1108-204, UT1108-205, UT1108-206, UT1108-207, UT1108-208, UT1108-209, UT1108-210, UT1108-211, UT1108-212, UT1108-242, UT1108-328, UT1108-330, UT1108-331, UT1108-332, UT1108-335, UT1108-337, UT1108-338, UT1108-339, UT1108-340, UT1108-341, UT1108-342, UT1108-343, UT1108-345, UT1108-348, UT1108-349 UT1108-350, UT1108-355, UT1108-361, UT1108-368, UT1108-369, and UT1108-370.

2008, but did not issue leases for the eighty parcels at issue.  Pursuant to an agreement filed jointly by the parties in this matter on December 18, 2008, BLM agreed not to issue the challenged leases until January 19, 2009.

The public lands at issue in this suit include tracts that are very close to Arches National Park, Canyonlands National Park, and Dinosaur National Monument.  In a November 24, 2008 letter to BLM, the National Park Service requested that 93 parcels be deferred from the December 19th sale, citing concerns about impacts to air quality, water quality and natural quiet from oil and gas development authorized by the lease sale.  In response, BLM deferred 33 parcels from the sale, leaving 60 of the parcels that the Park Service opposed on the auction block.  Some of these parcels are located in the Desolation Canyon wilderness character area, which is part of one of the largest roadless areas in the lower 48 states.  Still other parcels are located very close to the culturally significant Nine Mile Canyon, an area that BLM itself describes as "the longest outdoor art gallery in the world" because of the substantial concentration of prehistoric archeological sites and rock art.

As discussed in Plaintiffs' Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction, Plaintiffs satisfy the D.C. Circuit's test for obtaining this extraordinary relief.  In evaluating a motion for emergency relief, the court considers whether: (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably harmed if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction.  *Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1157 (D.C. Cir. 2007).  Here, the irreparable harm that will occur without injunctive relief and plaintiffs' likely

success on the merits justify the emergency injunctive relief requested by Plaintiffs.

Respectfully submitted,

___/s/ Sharon Buccino_____
Sharon Buccino (D.C. Bar # 432073)
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
(202) 289-6868

Stephen H.M. Bloch (UT Bar #7813)
David Garbett (NY Bar # 4580114)
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161

Robin Cooley (CO Bar # 31168)
Earthjustice
1400 Glenarm Pl. #300
Denver, CO 80202
(303) 623-9466

Attorneys for Plaintiffs
Southern Utah Wilderness Alliance *et al.*

Date: December 22, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| Southern Utah Wilderness Alliance, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:08-CV-02187-RMU |
| | ) | |
| Stephen Allred, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………......iii

LIST OF EXHIBITS…………………………………………………........viii

INTRODUCTION…………...………………..………………………………1

FACTUAL BACKGROUND……………………………………………..………2

I.   THE WILDERNESS QUALITY LANDS SUBJECT TO LEASE …….....…2
   A.   The Moab, Vernal, and Price Districts………………..……………2
   B.   Areas Included in The December Leases……………….…………....3

II.   UTAH BLM AUTHORIZES OIL AND GAS DEVELOPMENT
     ON WILDERNESS QUALITY LAND…………………………..……………5
   A.   BLM's Oil and Gas Leasing Procedures ……………………………6
   B.   BLM Finalizes Utah RMPs .............................................................8
   C.   The December Lease Sale………………………………………...9

ARGUMENT…………………………………………………………………11
I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE
     MERITS OF THEIR CLAIM THAT BLM VIOLATED NEPA
     BY IGNORING SIGNIFICANT AIR POLLUTION ISSUES IN THE
     MOAB, VERNAL, AND PRICE RMPS ...............................…….……...12
   A.   BLM Violated NEPA by Ignoring Air Pollution,
        Including the Impacts of Ozone Pollution on National
        Parks and Public Health………………………………….................13
        1.   Air Pollution caused by oil and gas development
             is a major threat to national parks and public health………..13
        2.   The FEISs for the Moab, Vernal, and Price
             RMPs fail to analyze and disclosure significant
             air pollution issues………………………………...………..15
             a.   The FEISs for the Moab and Price RMPs fail to
                  consider whether federal air quality standards
                  will be met………………………………………….17
             b.   The FEISs for the Moab, Vernal, and Price
                  RMPs ignore ozone pollution………………...................19

   B.   The FEISs for the Moab, Vernal, and Price RMPs Violated
        NEPA by Ignoring the Cumulative Impacts of Oil and Gas
        Development And  Motor Vehicle Use Authorized in the
        Travel Management Plans……………………………………...........22
        1.   Motor vehicle use on dirt roads in Utah
             leads to significant particulate pollution.....…….....................23

i

    2.  **BLM failed to consider the cumulative dust emissions from oil and gas development and other motor vehicle use**...................................……………………....24

**II.**  **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT BLM FAILED TO COMPLY WITH NEPA AND INTERIOR SECRETARY ORDER NO. 3226 BY IGNORING CLIMATE CHANGE**…................................................26

**III.**  **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT BLM FAILED TO COMPLY WITH THE NHPA**…………………………………………....…………….. 29

  **A.**  **Oil and Gas Leasing is an Undertaking under Section 106 of the NHPA**……………………………....……………………30

  **B.**  **BLM Failed to Comply with the Section 106 Consultation Process** …………………………………………………………31

    1.  **The area of potential effects for the proposed leases is arbitrarily narrow and excludes potentially affected historic properties in Nine Mile Canyon**……....…………….....32

    2.  **BLM's determination that the lease sale would have no effect on historic properties in Nine Mile Canyon is arbitrary and capricious**………..……………………………....35

**IV.**  **PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION**……………………….…………....37

  **A.**  **The Leases Commit BLM to Environmentally Destructive Oil and Gas Development**…………………....……………….. ...37

  **B.**  **BLM's Failure to Adequately Analyze the Environmental Harm Resulting from the Leases Causes Irreparable Harm to Plaintiffs**……………………….…………….…...……………38

**V.**  **THE IRREPARABLE HARM TO PLAINTIFFS OUTWEIGHS ANY POTENTIAL HARM TO DEFENDANTS**……………………….............42

**VI.**  **A PRELIMINARY INJUNCTION WOULD SERVE THE PUBLIC INTEREST**……………………………………………………................43

**CONCLUSION**…………………………………………………………... 44

# Table of Authorities

**CASES**                                                                    **PAGES**

*Alaska v. Andrus*
580 F.2d 465, 485-86 (D.C. Cir. 1978)……………………… ……………………..41

*Attakai v. United States*
746 F.Supp. 1395, 1407-08 (D. Ariz. 1990)………… ………………………………...31

*California v. Watt*
520 F. Supp. 1359, 1371 (C.D. Cal. 1981)  ……………………..…………… ……......37

*Citizen's Alert Regarding the Environment v. U.S. Dep't of Justice*,
1995 WL 748246 (D.D.C. 1995) …………………….................……………… …….43

*Center for Biological Diversity v. National Highway Traffic Safety Administration*
538 F.3d 1172, 1216-18 (9th Cir. 2008) ……………...…………………………..26

*Cobell v. Kempthorne*
455 F.3d 301, 314 (D.C. Cir. 1977) ………………………………………………..11

*Colorado River Indian Tribes v. Marsh*
605 F. Supp. 1425, 1437 (C.D. Cal. 1985) …………………………………………32

*Connor v. Burford*
848 F.2d 1441, 1451, 1461 (9th Cir. 1988) …….………..………………12, 37, 38, 41

*CTIA – The Wireless Ass'n v. Fed. Communications Comm'n*,
466 F3d 105, 113 (D.C. Cir. 2006) …………….………..………………………35

*Davis v. Mineta*,
302 F.3d 1104, 1114, 1115 & 1115 n.7 (10th Cir. 2002) ………..…….……………40

*Dubois v. U.S. Dep't of Agric.*,
102 F.3d 1273, 1286 (1st Cir. 1996)  …………….………………………………29

*Earth Island Inst. v. Forest Serv.*,
442 F.3d 1147, 1177 (9th Cir. 2006)..………… ……………………….……………43

*Ellipso v. Mann*,
480 F.3d 1153 (D.C. Cir.).....................…………… …   …………….……………11

*Cases principally relied upon.

*Environmental Defense Fund v. Tenn. Val. Auth.*,
    468 F.2d 1164, 1183-84 (6th Cir. 1972)). …………….……..………..……………40

*Fund for Animals v. Espy*,
    814 F. Supp. 142, 151 n.10 (D.D.C. 1993) …………………………..……....40, 43

*\*Gand Canyon Trust v. FAA*,
    290 F.3d 339, 342 (D.C. Cir. 2002) …………..…..……………………………….22

*Greater Yellowstone Coal. v. Bosworth*,
    209 F. Supp. 2d 156, 163 (D.D.C. 2002) …………….…..…………………………. 43

*Hopi Tribe v. Watt*,
    530 F. Supp. 1217, 1229 (D. Ariz. 1982) …………….…….….……………….. 27

*Izaak Walton League of America v. Marsh*,
    655 F.2d 346, 368-69 (D.C. Cir. 1981) …………...…………………………….....16

*Jones v. District of Columbia Redevelopment Land Agency*,
    499 F.2d 502, 511, 512-13 (D.C. Cir. 1974) ……………………….…..……….…40

*\*Mass. v. Clark*,
    594 F. Supp. 1373, 1388 (D. Mass. 1984) …………….…………..….…………… 39

*Mass v. EPA*,
    127 S. Ct. 1438, 1455 (2007) …………….…………………….. …………… 26

*Mass. v. Watt*,
    716 F.2d 946, 952, 953 (1st Cir. 1983)……… ………….….………..  39, 40, 41, 44

*Mid States Coalition for Progress v. Surface Transp. Board*,
    345 F.3d 520, 550, 553 (8th Cir. 2003) ….…………………. ..………………..26, 31

*Mobil Oil Corp. v. F.T.C.*,
    562 F.2d 170, 173 (2d Cir. 1977) …………….…………………………..…..12, 37

*Montana Wilderness Ass'n. v. Fry*,
    310 F. Supp. 2d 1127, 1152 (D. Mont. 2004) ……….…………………….30, 31, 34

*Mosely v. U.S.*,
    15 Ct. Cl. 193 (Ct. Cl. 1988) ……………..………….………..….……………… 41

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29, 43, 57 (1983) ……………….………………………………. 16, 35, 36

*Muckleshoot Indian Tribe v. U.S. Forest Serv.,*
    177 F.3d 800, 805 (9th Cir. 1999). …………………..…….……………………………… 41

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967, 981 (2005)…… …………………...……………………………… ……..37

*Natural Res. Def. Council v. Hodel,*
    865 F.2d 288, 299 (D.C. Cir. 1988) …………………………………..………………… 22

*Natural Res. Def. Council v. Kempthorne,*
    506 F.Supp. 2d 322, 367-70 (E.D. Cal. 2007)…. …..……………………………………27

*National Wildlife Fed. V. Andrus*
    440 F.Supp. 1245, 1256 (D.D.C. 1977)  …………….…………………………..……….43

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*
    137 F.3d 1372,1379, 1380 (9th Cir. 1998)  ……..……..……………………………22, 25

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt,*
    459 F.Supp. 2d 1102, 1125 (D.N.M. 2006) …………..……………………. …30, 32

*Northern Cheyenne Tribe v. Hodel,*
    851 F.2d 1152, 1157 (9th Cir. 1988) …………………..……………………………..… 40
.
*Pennaco Energy v. U.S. Dep't of the Interior,*
    377 F.3d 1147, 1151 (10th Cir. 2004) ………………………………………………… 6

*Pueblo of Sandia v. United States,*
    50 F.3d 856, 860 (10th Cir. 1995) …………………….……………….……….. ………..34

*Realty Income Trust v. Eckerd,*
    564 F.2d 447, 456 (D.C. Cir. 1977) …..…………………………………………………40

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332, 349, 350 (1989) ………..……..……………………. ………..16, 25, 38

*Scientists Inst. For Pub. Info v. Atomic Energy Comm'n,*
    481, F.2d 1079, 1092 (D.D.Cir. 1973) ..…………………………………………… ….29

*Secretary of the Interior v. California,*
    464 U.S. 312 (1984)  .……………………………………………………………...…..37

*Sierra Club v. Marsh,*
    872 F.2d at 497 (1st Cir. 1989) …………………..……….…………………………40, 41

*Sierra Club v. Peterson*,
717 F.2d 1409, 1411, 1414, 1415 (D.C. Cir. 1983)……..............7, 12, 19, 21, 25, 37, 38

*SUWA v. Norton*,
457 F. Supp. 2d 1253 (D. Utah 2006), *aff'd in part, appeal dismissed in part*,
525 F.3d 966 (10th Cir. 2008) ...................................................................................6, 7, 8

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
559 F.2d 841, 844 (D.C. Cir. 1977) …………………………………………..……11

*Western Oil & Gas Ass'n v. Alaska*,
439 U.S. 922 (1978) ……………..……………..……………..………………… 41

*Wilson v. Block*,
708 F2d 735, 754 (D.C. Cir. 1983) ……………..………………………..………………32

*Wilderness Society v. Wisely*,
524 F. Supp. 2d 1285, 1306 n.12 (D. Colo. 2007) .…............................................…. 42

*Wyoming Outdoor Coordinating Council v. Butz*,
484 F.2d 1244, 1250 (10th Cir. 1973) …………………………………………………43

## FEDERAL STATUTES
United States Code ("U.S.C.")

5 U.S.C. §706, 706(2)(A) …………………………………….....………….……………… 35, 42
16 U.S.C. §§ 470(f), h-2(a), *et. Seq*...……..…………..………….…………..1, 29, 30, 34, 36, 41
30 U.S.C. § 191 ……………………….…..………………………………………………… 41
42 U.S.C. §§ 4321, 4332. ……………..…………………...………………………… 1, 12, 38
42 U.S.C. § 7408…………………………………………………………………… ...13
42 U.S.C. § 7409 ………………….……………………………………………...13, 18
42 U.S.C. § 7475(d)(1)(B) …………………………………………………...………………15
43 U.S.C. § 1701 *et seq.* …………………………………………………………………1
43 U.S.C. § 1712  ……………………………………………………………...6
43 U.S.C. § 1712(c)(8)  …………………………….………………………..…………15, 21
43 U.S.C. § 1732(a)  ……..…………………………………………………………….6

## CODE OF FEDERAL REGULATIONS

36 C.F.R § 800.2(d), ……….……………………………………………...31, 34
36 C.F.R § 800.3, (a), (f) ……………………………..……………… ….......30, 31, 34
36 C.F.R.§ 800.4…………………………………….…………………….......31, 32, 34
36 C.F.R. § 800.5…………………………….…………………………………….31,32
36 C.F.R. § 800.6, (a) ……..………………..……………………………………….31, 32
36 C.F.R. § 800.16(d) …………………….…..…………………………………...32

40 C.F.R. § 50.1, ... …………………………...……………………………….. ...18
40 C.F.R. §§ 50.4 - 50.4-13 ……………………………………………………13, 18
40 C.F.R. § 50.6 …………………………………………………………….……...... 23
40 C.F.R. § 50.7 ……………………………………………………………….....23
40 C.F.R. § 1502.2(d) ………………………………………………………………15
40 C.F.R § 1502.15 ……………………………………………………………….27
40 C.F.R. § 1502.24 ……………………………………………………………16
40 C.F.R. § 1508.25(c)..................................………………………… 22
40 C.F.R. §1508.27(b) ……………………………………..…… ……....15, 16, 18
43 C.F.R. § 1601.0-2....................................................................................6
43 C.F.R. § 1601.0-5(b)..............................................................................6
43 C.F.R. § 1610.0-6 ………………………………………………………… 6
43 C.F.R. § 1610.5-2 …… ……………………………………………………… …......9
43 C.F.R. § 2920.7(b)(3) … ……………………….…………………........16,22
43 C.F.R. § 3101.1-2 .… ………………………….………...…… 8, 12, 21, 37
43 C.F.R. § 3110.3-1......................................................................................7
43 C.F.R. § 3120.............................................................................................7
43 C.F.R. § 3120.1-2 …………………………………………………………6, 7, 42
43 C.F.R. § 3120.1-3 .…................................................................................ 7
43 C.F.R. § 3120.3..........................................…………………………………… 6
43 C.F.R. § 3120.4-2 ………………………………………………………………7
43 C.F.R. § 3120.5 ……………………………………………………………… 7
43 C.F.R. § 3120.6 …………………………………………………………....…7

## FEDERAL REGISTER

66 Fed. Reg. 56,343 (Nov. 7, 2001)..................................................................9
69 Fed. Reg. 42,765 (July 16, 2004)................................................................9
71 Fed. Reg. 2620 (Jan. 17, 2006) ...........................................................13, 23
73 Fed. Reg. 16,436 (Mar. 27, 2008)........................................................13, 14
73 Fed. Reg. 50,983 (August 29, 2008)............................................................9
73 Fed. Reg. 64,983 (October 31, 2008)...........................................................9

# LIST OF EXHIBITS

1     Decision to Lease (Dec. 12, 2008).

2     BLM, Moab Field Office, Proposed Resource Management Plan and Final Environmental Impact Statement (Aug. 2008) (excerpts).

3     BLM, Price Field Office, Proposed Resource Management Plan and Final Environmental Impact Statement (Aug. 2008) (excerpts).

4     BLM, Vernal Field Office, Proposed Resource Management Plan and Final Environmental Impact Statement (Aug. 2008) (excerpts).

5     Map, Price Area Parcels (Dec. 2008).

6     BLM, Utah Wilderness Inventory, Desolation Canyon (1999), available at http://www.access.gpo.gov/blm/utah/pdf/ne127.pdf.

7     BLM, Utah Wilderness Inventory, Jack Canyon (1999), available at http://www.access.gpo.gov/blm/utah/pdf/ne128.pdf.

8     Map, White River Area Parcels (Dec. 2008).

9     BLM, Utah Wilderness Inventory, White River (1999), available at http://www.access.gpo.gov/blm/utah/pdf/ne140.pdf.

10    Map, Arches and Canyonlands Area Parcels (Dec. 2008).

11    Declaration of Liz Thomas.

12    Declaration of Ray Bloxham.

13    Declaration of Wayne Hoskisson.

14    Map, Dinosaur National Monument Area Parcels (Dec. 2008).

15    Map, Green River Area Parcels (Dec. 2008).

16    Other Playgrounds: Nine-Mile Canyon, http://www.utah.com/playgrounds/nine_mile.htm (last visited Dec. 16, 2008).

17    BLM, Nine Mile Canyon – What to See and Do, http://www.blm.gov/ut/st/en/fo/price/recreation/9mile/9mile_col2.html (last visited Dec. 16, 2008).

18    Editorial, "Last-Minute Mischief", N.Y. Times, Oct. 18, 2008.

19      BLM, Director's Protest Resolution Report, Vernal Resource Management Plan
        (Oct. 28, 2008).

20      Notice of Competitive Lease Sale Oil and Gas (Nov. 4, 2008).

21      Proposal to Lease (Nov. 4, 2008).

22      Felicity Barringer, "U.S. to Open Public Land Near Parks for Drilling", N.Y. Times
        (November 7, 2008).

23      National Park Service Memorandum: Notice of December 19, 2008 Competitive
        Oil & Gas Lease Sale of Lands Proximal to Arches National Park, Canyonlands
        Park and Dinosaur National Monument (Nov. 24, 2008) (NPS Memo).

24      Errata Sheet: Notice of Competitive Lease Sale scheduled for Dec. 19, 2008 (Dec.
        2, 2008).

25      BLM, Price Field Office, Worksheet: Documentation of Land Use Plan
        Conformance and Determination of NEPA Adequacy (DNA), December 2008
        Lease Sale & Cultural Resource Assessment of December 2008 Oil & Gas Lease
        Sale & Cultural Resource Assessment of November 2008 Oil & Gas Lease Sale.

26      BLM, Vernal Field Office, Worksheet: Documentation of Land Use Plan
        Conformance and Determination of NEPA Adequacy (DNA), December 2008
        Lease Sale & Gabrielle Elliot, A Cultural Resource Evaluation & Comments
        Concerning the December, 2008 Oil Gas Lease Sale in Uintah, Daggett and
        Duchesne Counties, Utah.

27      BLM, Moab Field Office, Worksheet: Documentation of Land Use Plan
        Conformance and Determination of NEPA Adequacy (DNA), December 2008
        competitive Oil and Gas Lease Sale.

28      Trinity Consultants, Air Quality Assessment Report Vernal and Glenwood Springs
        Resource Management Plans (Jan. 2006) (excerpts).

29      Moab RMP Air Quality Support Document.

30      BLM, Price Field Office, West Tavaputs Plateau Natural Gas Full Field
        Development Plan Draft Environmental Impact Statement UT-070-05-055 (Feb.
        2008) ("West Tavaputs DEIS") (excerpts).

31      Letter from Larry Svoboda, Envtl. Prot. Agency, to Brent Northrup, Bureau of Land
        Management, Moab Field Office (Sept. 12, 2008).

32      Letter from Larry Svoboda, Envtl. Prot. Agency to Selma Sierra, Bureau of Land
        Management (Sept. 23, 2008).

33      Letter from Larry Svoboda, Envtl. Prot. Agency to Selma Sierra, Bureau of Land
        Management (Oct. 2, 2008).

34      Letter from Robert E. Roberts, Envtl. Prot. Agency, to Selma Sierra, BLM (May
        23, 2008) (EPA West Tavaputs Letter).

35      SUWA et al. Protest of the Dec. 2008 Lease Sale (Dec. 4, 2008).

36      BLM, Response to Public Comments, Comments on the [Moab] Draft EIS by
        Resource Type.

37      BLM, Response to Public Comments, Comments on the [Vernal] Draft RMP/EIS
        by Resource.

38      BLM, Public Comments and Responses – Price Draft RMP/EIS – July 2004, Sorted
        by Category.

39      Council on Environmental Quality, Executive Office of the President, Considering
        Cumulative Effects Under the National Environmental Policy Act (January 1997).

40      BLM, Public Comments and Responses – Price Draft RMP/EIS WC Supplement –
        September 2007, Sorted by Category.

41      Intergovernmental Panel on Climate Change, Climate Change 2001: Working
        Group II: Impacts, Adaptation and Vulnerability, available at
        http://www.grida.no/climate/ipcc_tar/wg2/197.htm (last visited Dec. 16, 2008).

42      BLM, Director's Protest Resolution Report, Price Resource Management Plan (Oct.
        29, 2008).

43      Interior Secretary Order 3226.

44      SUWA et al. Comments, Moab DRMP/DEIS (Nov. 30, 2007) (excerpts).

45      SUWA et al. Protest of the Moab Field Office PRMP and FEIS (Sept. 2, 2008).

46      U.S. Climate Change Science Program and the Subcommittee on Global Change
        Research, The Effects of Climate Change on Agriculture, Land Resources, Water
        Resources, and Biodiversity in the United States, Synthesis and Assessment
        Product 4.3 (June 2008) (excerpts).

47      BLM, Finding of No Significant Impact and Decision Record, West Tavaputs
        Plateau Drilling Program, Carbon and Duchesne Counties, Utah, Environmental
        Assessment UT-070-2004-28 (July 29, 2004).

48      Letter from Leigh J. Kuwanwisiwma, Director, Hopi Cultural Preservation Office,

to Michael Stiewig, Acting Field Office Manager, Price Field Office (Nov. 24, 2008).

49    Jerry Spangler Colorado Plateau Archaeological Alliance Comments on West Tavaputs Plateau Natural Gas Full Field Development Plan Draft Environmental Impact Statement (Apr. 23, 2008).

50    Letter from Keith Montgomery, Montgomery Archaeological Consultants, to Blaine Miller, Bureau of Land Management (Aug. 2, 2002).

51    Letter from Wayne Luddington, BLM to Lori Hunsaker, State Historic Preservation Officer, Re: Quarterly Log and Reports (Dec. 5, 2008).

52    Declaration of Bill Hedden.

53    Declaration of Karen Hevel-Mingo.

54    Declaration of Steven C. Hansen.

55    *California v. Watt*, No. 81-2080 (C.D. Cal. May 29, 1981) (Order Granting Preliminary Injunction).

56    House Appropriations Subcommittee on Interior, Environment, and Related Agencies: Written responses from Secretary Dirk Kempthorne to questions submitted for the hearing record by Rep. Maurice Hinchey, oversight hearing on the FY 2008 Department of the Interior budget proposal (March 1, 2007)

57    BLM, Director's Protest Resolution Report, Moab Resource Management Plan (Oct. 31, 2008)

58    BLM, MOAB Field Office, Record of Decision and Approved Resource Management Plan (October 2008)

59    BLM, Price Field Office, Record of Decision and Approved Resource Management Plan (October 2008)

60    BLM, Vernal Field Office, Record of Decision and Approved Resource Management Plan (October 2008)

**INTRODUCTION**

On December 12, 2008, the Bureau of Land Management (BLM) decided to lease for oil and gas development more than 110,000 acres in Utah's wild red rock country. This development will threaten the air quality of some of our nation's most treasured national parks and monuments, including Arches National Park, Canyonlands National Park, and Dinosaur National Monument.  It will destroy the wilderness character of iconic wild places like the Desolation Canyon stretch of the Green River, which is part of one of the largest roadless areas in the lower forty-eight states.  This development will also harm the irreplaceable archeological sites and rock art of Nine Mile Canyon, which BLM has described as "the longest outdoor art gallery in the world."

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65.1, Plaintiffs Southern Utah Wilderness Alliance, Natural Resources Defense Council, the Wilderness Society, National Parks Conservation Association, Sierra Club, Grand Canyon Trust and the National Trust for Historic Preservation move for a temporary restraining order and preliminary injunction to prevent BLM from issuing these leases, actions that will result in irreparable injury to Plaintiffs.

Plaintiffs are likely to succeed on the merits of their claims because BLM ignored the tremendous environmental impacts of oil and gas development in violation of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, the National Historic Preservation Act (NHPA), 16 U.S.C. §§ 470 *et seq.*, the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq.*, and Interior Secretary Order No. 3226.  Rather than carefully considering the environmental impacts as required by law, BLM rushed to complete the challenged lease sale before a new administration—one that

has publicly criticized the lease sale—takes office in January 2009.  Indeed, the agency ignored the comments of the Environmental Protection Agency (EPA), National Park Service, the Hopi Tribe, and numerous environmental and historic preservation organizations.

**FACTUAL BACKGROUND**

## I.      THE WILDERNESS QUALITY LANDS SUBJECT TO LEASE

On December 12, 2008, BLM's Utah State Office decided to lease for oil and gas development more than 110,000 acres in Utah's wild red rock country.  Decision to Lease (Dec. 12, 2008) (attached as Exh. 1).  BLM conducted the lease on December 19, 2008.  The agency sold the challenged leases, but did not issue them pursuant to a joint stipulation filed with the Court on December 18, 2008.  The areas subject to lease are managed by three different BLM field offices:  Moab, Vernal, and Price.  *Id.*[1]

### A.      The Moab, Vernal, and Price Districts

The Moab, Vernal, and Price districts manage a large percentage of Utah's red rock wilderness quality lands and are adjacent to some of the nation's most famous national parks and monuments.  The Moab field office is responsible for 1.8 million acres of public lands in eastern Utah, including lands adjacent to Arches National Park and Canyonlands National Park.  Moab Proposed Resource Management Plan (Moab RMP) at 3-32 (excerpts attached as Exh. 2).  The Moab district is home to landmarks such as Labyrinth Canyon and Harts Point, as well as popular recreation and hunting destinations like Monitor and Merrimac Buttes and the southern slope of the Book Cliffs.  *Id.* at 3-67, 3-69, 3-83, 3-91, 3-166, 3-175.

---

[1] Although BLM is offering a small number of parcels managed by the Richfield field office, Plaintiffs are not challenging those leases.

The Price field office manages 2.5 million acres of public lands in the central and eastern part of Utah, including the San Rafael Swell, with its red rock canyons and spires, and Nine Mile Canyon, a virtual outdoor museum of cultural sites.  Price Proposed Resource Management Plan at 3-1 (Price RMP) (excerpts attached as Exh. 3).  Desolation Canyon, named by explorer John Wesley Powell in the late 1860s, forms the eastern boundary of the Price field office and offers a popular multi-day river running experience without the sight or sound of human development.  *Id.* at 3-92.

Located in northeastern Utah, the Vernal field office oversees management of 1.7 million acres of public lands, including wilderness character areas such as the White River and the Book Cliffs.  Wolf Point, Bitter Creek, Hells Hole Canyon, Lower Bitter Creek, Mexican Point, Hideout Canyon, and Sweetwater Canyon are all areas with wilderness character in the Book Cliffs.  Vernal Proposed Resource Management Plan at 3-45, 3-48 (Vernal RMP) (excerpts attached as Exh. 4).  These areas are increasingly becoming isolated islands in a sea of natural gas and oil development in the Uintah Basin, one of the largest onshore natural gas basins in the country.  The Vernal district includes part of Dinosaur National Monument, which straddles the state line between Utah and Colorado and is a popular destination for river runners and paleontologists alike.  *Id.* at 3-55, 3-56, 3-66, 3-124, 3-125.

## B.    Areas Included in The December Leases

The December Leases include thousands of acres that BLM and others have recognized for their wilderness qualities.[2]  For example, BLM intends to lease thirteen

---

[2] Pursuant to FLPMA, BLM conducts wilderness inventories of Utah's public lands.  The first inventory culminated in the designation in 1980 of 3.2 million acres as "wilderness study areas," which are off-limits to oil and gas development.  43 C.F.R. § 2100.0-3(a)(2)(viii).  The second inventory, completed in 1999, revealed that BLM had previously overlooked 2.6 million acres with wilderness characteristics.  These

parcels within the Desolation Canyon wilderness character area. *See* Map, Price Area Parcels (Dec. 2008) (attached as Exh. 5). BLM describes the Desolation Canyon area as "one of the largest blocks of roadless BLM public lands within the continental United States. This is a place where a visitor can experience true solitude—where the forces of natural continue to shape the colorful, rugged landscape."[3] Another parcel is located in the Jack Canyon wilderness character area. BLM has stated that "scenic views of the vast canyons and surrounding landscapes, both within the unit[] and into the Desolation Canyon [wilderness study area], enhance the feeling of remoteness, vastness, and being truly alone."[4] Six lease parcels are located in the White River wilderness character area. *See* Map, White River Area Parcels (Dec. 2008) (attached as Exh. 8). According to BLM, this area's "deep canyons, high ridges, cliffs and unique geologic features create spectacular vistas," and its scenic beauty is "exceptional."[5]

Another parcel is located immediately east of Arches National Park in the Dome Plateau wilderness character area. *See* Map, Arches and Canyonlands Area Parcels (Dec. 2008) (attached as Exh. 10). Nine parcels are located northwest of Moab in the

---

areas are known as "wilderness inventory areas." *See, e.g., SUWA v. Norton*, 457 F. Supp. 2d 1253, 1256–57 (D. Utah 2006) (discussing Utah's wilderness inventories). BLM has also identified additional areas with wilderness characteristics as part of the land use planning process that resulted in the RMPs challenged in this case. Plaintiffs use the term "wilderness character areas" to describe areas where BLM has confirmed either through an inventory or in the land use planning process that the area has wilderness characteristics. Additional wilderness quality lands have been proposed for wilderness designation as part of America's Red Rock Wilderness Act (H.R. 1919/S. 1170). The Act would designate approximately 9.5 million acres of BLM-managed land in Utah as wilderness. Plaintiffs use the term "proposed wilderness" to describe areas covered by this proposal that are not recognized by BLM as having wilderness character.

[3] Utah Wilderness Inventory, Desolation Canyon at 127 (1999), *available at* http://www.access.gpo.gov/blm/utah/pdf/ne127.pdf (attached as Exh. 6).

[4] Utah Wilderness Inventory, Jack Canyon at 128 (1999), *available at* http://www.access.gpo.gov/blm/utah/pdf/ne128.pdf (attached as Exh. 7).

[5] Utah Wilderness Inventory, White River at 140 (1999), *available at* http://www.access.gpo.gov/blm/utah/pdf/ne140.pdf (attached as Exh. 9).

Labyrinth Canyon wilderness character area, Floy Canyon wilderness character area, and the Duma Point proposed wilderness unit.  *See* Exh. 10.  These areas include popular hiking destinations, prehistoric cultural sites (such as rock art panels and granaries), sand dunes, washes, and streams.  Declaration of Liz Thomas, ¶ 10 (attached as Exh. 11).

Eighteen lease parcels are located in eastern Utah's remote Book Cliffs in places such as Sunday School Canyon, Seep Canyon, Coal Canyon, Diamond Canyon, and Bitter Creek proposed wilderness units.  Exh. 10; *see also* Declaration of Ray Bloxham, ¶¶ 13–14 (attached as Exh. 12).  The Hatch Wash and Harts Point proposed wilderness areas, east of Canyonlands National Park, are subject to seven leases.  Exh. 10.  These parcels provide opportunities for primitive recreation and offer dramatic views of Canyonlands National Park's Needles District and the La Sal Mountains.  *See* Declaration of Wayne Hoskisson, ¶ 7 (attached as Exh. 13).  One lease parcel is located both immediately adjacent to and a few miles west of Dinosaur National Monument.  *See* Map, Dinosaur National Monument Area (Dec. 2008) (attached as Exh. 14).

Other parcels also contain popular recreation sites.  For example, BLM will offer eleven parcels outside Moab, including Bartlett Wash and Tusher Canyon, that are popular family camping and biking destinations.  Another four lease parcels located along the Green River are popular for canoeing and river rafting.  *See* Map, Green River Area Parcels (Dec. 2008) (attached as Exh. 15); Exh. 11 ¶¶ 11–12; Exh. 12 ¶¶ 15–16.

Seven parcels are located very close to the culturally significant Nine Mile Canyon in eastern Utah.  *See* Exh. 5.  Nine Mile Canyon has been described by the State of Utah as an "outdoor museum" that "should be shown the respect due to one of the

West's ancient treasures."[6]  BLM acknowledges that Nine Mile Canyon contains "the greatest concentration of rock art sites" in the United States.[7]

## II.   UTAH BLM AUTHORIZES OIL AND GAS DEVELOPMENT ON WILDERNESS QUALITY LAND.

### A.   BLM's Oil and Gas Leasing Procedures

Pursuant to FLPMA, BLM must develop comprehensive Resource Management Plans (RMPs) that provide the blueprint for how public lands are managed within BLM planning areas.  43 U.S.C. § 1712; 43 C.F.R. § 1601.0-2; *see also Pennaco Energy v. U.S. Dep't of the Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004) ("Generally a land use plan describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps.") (internal citation omitted).[8]  Among other things, RMPs allocate lands available for oil and gas leasing and impose conditions on that leasing. *SUWA v. Norton*, 457 F. Supp. 2d 1253, 1255 (D. Utah 2006), *aff'd in part, appeal dismissed in part*, 525 F.3d 966 (10th Cir. 2008).  Future site-specific actions within the planning area, including lease sales, must be consistent with the relevant RMP.  43 U.S.C. § 1732(a); 43 C.F.R. §§ 1601.0-5(b).

BLM conducts lease sales quarterly.  43 C.F.R. § 3120.1-2.  First, members of the oil and gas industry nominate particular parcels that they are interested in developing.  *Id.*

---

[6] Utah Travel Industry Website, Other Playgrounds: Nine Mile Canyon, http://www.utah.com/playgrounds/nine_mile.htm (last visited Dec. 16, 2008) (attached as Exh. 16).
[7] Bureau of Land Management, Nine Mile Canyon – What to See and Do, http://www.blm.gov/ut/st/en/fo/price/recreation/9mile/9mile_col2.html (last visited Dec. 16, 2008) (attached as Exh. 17).

[8] BLM prepares an environmental impact statement (EIS) under NEPA as part of the RMP planning process:  "Approval of a resource management plan is considered a major federal action significantly affecting the quality of the human environment.  The environmental analysis of alternatives and the proposed plan shall be accomplished as part of the [RMP] planning process and, wherever possible, the proposed plan and related [EIS] shall be published in a single document."  43 C.F.R. § 1610.0-6.  The EIS is to provide a comprehensive look at alternatives for managing the public lands and to assess the environmental impacts of those alternatives.

§ 3120.3.  Next, BLM prepares a preliminary list of oil and gas lease parcels to be offered

at that sale.  In accordance with its NEPA duty to analyze the environmental impacts of

agency actions, BLM then prepares a "Determination of NEPA Adequacy" or "DNA" for

the proposed lease sale.  *SUWA v. Norton*, 457 F. Supp. 2d at 1255.  Through DNAs

BLM determines whether previously-prepared NEPA documents satisfy its legal

obligations for a proposed project.  *Id.*  Like any NEPA document, the DNA provides

information to BLM on the environmental impacts of its decisions.  Based on such

information, BLM may modify the list of parcels available for sale.

Once BLM has a final sale list, it notifies the public.  The sale must take place no

less than 45 days after this public notification.  43 C.F.R. § 3120.4-2.  Also running from

the date of the public notice is a 30-day protest period, during which members of the

public may protest BLM's decision to include certain parcels in the lease sale.  *Id.*

§§ 4.21, 3120.1-3.

At the lease sale, BLM conducts a public auction for each parcel.  *Id.* § 3120.5.  If

a lease is not sold on the day of the sale, it remains available for purchase at a reduced

rate for the next two years.  *Id.* § 3120.6.  Leases have terms of 10 years, but can be held

indefinitely if they are producing oil or gas in paying quantities.  *Id.* §§ 3110.3-1, 3120.

BLM may be issue leases with certain stipulations, including stipulations

prohibiting any surface disturbance—known as a "no surface occupancy" or "NSO"

stipulation.  *See Sierra Club v. Peterson*, 717 F.2d 1409, 1411 (D.C. Cir. 1983).  If a

lease is issued without an NSO stipulation covering the entire leasehold, the lessee has

the "right to use so much of the leased lands as is necessary to explore for, drill for, mine,

extract, remove, and dispose of all the leased resource in a leasehold."  43 C.F.R.

§ 3101.1-2.  In other words, BLM cannot deny the company the right to drill somewhere on the lease.

###### B.    BLM Finalizes Utah RMPs.

In 2001, BLM began developing six RMPs covering more than 11 ½ million acres of Utah's public lands.  These new RMPs were necessary because BLM was operating under old, outdated land use plans that had never considered BLM's more recent inventories finding millions of acres of remarkable, wilderness quality lands in Utah.  *See SUWA v. Norton*, 457 F. Supp. 2d at 1256–57.  Despite this lack of analysis, in 2003, BLM proposed to lease lands it had acknowledged were of wilderness quality for oil and gas development.  *Id.* at 1257.  Many of the same plaintiffs as in this case challenged the proposed sale.  The court held that BLM could not lease the parcels in question until it completed a supplemental environmental analysis that considered the wilderness quality of the lands in question.  *Id.* at 1264–69.  As a result of this suit, the wilderness character lands now included in the December Lease Sale were off-limits to oil and gas leasing absent a new environmental analysis by BLM.[9]

That new analysis came in the form of the six Utah RMPs and EISs that were already underway.  The six RMPs included the Moab, Vernal, and Price RMPs challenged in this case and three others.  Between 2001 and 2007, in a staggered fashion, BLM conducted public scoping and released the six draft RMPs and EISs for public comment.  *See, e.g.,* 66 Fed. Reg. 56,343 (Nov. 7, 2001); 69 Fed. Reg. 42,765 (Jul. 16,

---

[9] *See, e.g.,* Utah BLM News Release, BLM Utah to Hold Oil and Gas Lease Sale Feb. 20, http://www.blm.gov/ut/st/en/info/newsroom/2007/02/blm_utah_to_hold_oil.html ("In response to a Federal court ruling by Judge Kimball in August of 2006, the BLM will not offer any lands for lease that have been inventoried and determined by BLM to have wilderness characteristics.  BLM is currently reviewing information from wilderness inventories and incorporating it in its land use planning efforts.  Leasing decisions for lands that have been determined to have wilderness characteristics will be postponed until additional environmental analysis (NEPA) or planning is complete.").

2004).  However, in August and September 2008, as the end of the Bush Administration

loomed, BLM released all six proposed RMPs and final EISs within a matter of weeks.

*See* 73 Fed. Reg. 50,983 (Aug. 29, 2008); "Last Minute Mischief," <u>The New York Times</u>

(Oct. 18, 2008) (attached as Exh. 18).

Because BLM's regulations require all legal protests of RMPs to be filed within

30 days, 43 C.F.R. § 1610.5-2, Plaintiffs were forced to file protests on six different

RMPs covering huge swaths of land within a short window of time.  BLM denied or

otherwise rejected the vast majority of Plaintiffs' protests of the Moab, Vernal, and Price

RMPs.  *See, e.g.*, Director's Protest Resolution Report, Vernal RMP (Oct. 28, 2008)

(attached as Exh. 19).

On October 31, 2008, BLM signed the record of decisions (RODs) finalizing all

three RMPs.  73 Fed. Reg. 64,983 (Oct. 31, 2008).  The RMPs paved the way for the

December Lease Sale, opening a significant amount of wilderness quality land to oil and

gas development.

     **C.**    **The December Lease Sale**

Once it signed the RODs for the Moab, Vernal, and Price RMPs on October 31,

2008, BLM wasted no time offering the newly-opened wilderness quality lands for lease.

On November 4, 2008, BLM published a final sale list that included 241 lease parcels.

Notice of Competitive Lease Sale (Nov. 4, 2008) (attached as Exh. 20).  Also on

November 4, 2008, BLM issued a "Proposal to Lease," which stated that the "final

determination to offer parcels for the December 19, 2008 oil and gas lease sale will be

made no later than December 12, 2008."  Proposal to Lease (Nov. 4, 2008) (attached as

Exh. 21).  The final sale list included thousands of acres of wilderness character areas,

including lands immediately adjacent to Arches and Canyonlands National Parks and Dinosaur National Monument.

After BLM announced the final sale list, the National Park Service complained that it has been left out of the process.  According to National Park Service employees, BLM typically allows the Park Service 30 days to comment on proposed lease sales that may impact park resources, and that process was not followed in this case.  *See* Felicity Barringer, "U.S. to Open Public Land Near Park for Drilling," <u>New York Times</u> (Nov. 8, 2008) (attached as Exh. 22).  On November 24, 2008, Mike Snyder, the Park Service's Intermountain Regional Director requested that BLM defer leasing 93 parcels on the final sale list.  NPS, Memorandum to Director, Utah BLM State Office 2 (Nov. 24, 2008) (NPS Memo) (attached as Exh. 23).  The Park Service was concerned about the impacts of oil and gas development on park air quality, water quality, and natural sound.  In response, BLM deferred only 24 parcels.  *See* BLM, Errata Sheet (Dec. 2, 2008) (attached as Exh. 24).[10]

BLM did not prepare site-specific NEPA documents for the leasing decision, relying instead on DNAs prepared for each planning area.  Price DNA (attached as Exh. 25); Vernal DNA (attached as Exh. 26); Moab DNA (attached as Exh. 27).  BLM completed the DNA for the Vernal field office on November 3, 2008, the Price field office on November 4, 2008, and the Moab field office on November 5, 2008.  All three were updated on November 25, 2008.  In the DNAs, BLM found the FEISs for the Moab, Vernal, and Price RMPs were sufficient to meet its NEPA obligations for the December

---

[10] The parcels deferred were some, but not all, of the most egregious ones.  The deferred parcels were directly adjacent to the Arches and Canyonlands National Parks and Dinosaur National Monument.

Lease Sale.  The DNA's are BLM's final word on its NEPA compliance for the December Lease Sale.

On December 12, 2008, BLM issued a "Decision to Lease" finalizing the agency's decision to lease 132 parcels (163,935 acres) at the December Lease Sale.  Exh. 1.  Plaintiffs are challenging 80 of these parcels.  None of these 80 parcels include comprehensive NSO stipulations.

## ARGUMENT

The purpose of a preliminary injunction is to maintain the "status quo" pending a final determination of the merits of a case.  *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006); *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C. Cir. 1977).  Emergency injunctive relief is appropriate where plaintiffs demonstrate:  (1) they have a substantial likelihood of success on the merits; (2) they are likely to suffer irreparable harm if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.  *Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1157 (D.C. Cir. 2007).  Where the balance of harms tips strongly in the moving party's favor, it must demonstrate only that "questions going to the merits [are] so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation."  *Wash. Metro.*, 559 F.2d at 844 (D.C. Cir. 1977) (quotation omitted).  Petitioners satisfy this four-part standard and are entitled to injunctive relief.

I.      **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT BLM VIOLATED NEPA BY IGNORING SIGNIFICANT AIR POLLUTION ISSUES IN THE MOAB, VERNAL, AND PRICE RMPS.**

NEPA is a "look before you leap" statue.  It requires federal agencies to take a "hard look" at the environmental impact of its actions prior to making any "irreversible or irretrievable" commitment of resources.  42 U.S.C. § 4332; *Sierra Club v. Peterson*, 717 F.2d at 1414.  As recognized by the D.C. Circuit, an oil and gas lease that does not prohibit all surface use constitutes an "irreversible and irretrievable commitment of resources."  *Peterson*, 717 F.2d at 1414 (quoting *Mobil Oil Corp. v. F.T.C.*, 562 F.2d 170, 173 (2d Cir. 1977)).

At the leasing stage, BLM makes an "irrevocable commitment" to allow construction of roads, well pads, and pipelines.  *Id.* at 1414-15.  BLM regulations provide that unless otherwise stipulated in the lease, "[a] lessee shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold."  43 C.F.R. § 3101.1-2.  Accordingly, once the lease is issued, BLM no longer has the authority to prevent some level of development.  *Peterson*, 717 F.2d at 1415; *see also Connor v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988) ("In sum, the sale of a[n] oil and gas lease [that does not prohibit surface use] constitutes the 'point of commitment;' after the lease is sold the government no longer has the ability to prohibit potentially significant inroads on the environment.").  Because the December Leases are the point of commitment, BLM must fully consider the environmental impacts of the leases—including an air pollution— *before* selling them.

BLM has failed to do so in this case.  BLM's DNAs rely entirely on the FEISs for the Moab, Vernal, and Price RMPs to satisfy its NEPA obligations.  However, these

FEISs violate NEPA by failing to analyze significant air quality issues, including whether oil and gas development authorized under the plans would lead to violations of federal air quality standards and the impacts of ozone pollution on national parks and public health. The FEISs also violated NEPA by ignoring the cumulative air impacts of the December Lease Sale and off-road vehicle use authorized under the Moab, Price, and Vernal RMPs.

> **A.     BLM Violated NEPA by Ignoring Air Pollution, Including the Impacts of Ozone Pollution on National Parks and Public Health.**
>
> > **1.     Air pollution caused by oil and gas development is a major threat to national parks and public health.**

Oil and gas development results in emissions of numerous pollutants that are regulated under the Clean Air Act, including ozone, particulate matter, nitrogen oxides, sulfur dioxide, carbon monoxide, and hazardous air pollutants.  Air emissions associated with oil and gas development begin at the surface disturbing stage and continue through full development.  *See* Trinity Consultants, Air Quality Assessment Report Vernal and Glenwood Springs RMPs 17-28 (Jan. 2006) (showing that construction of access roads and well pads results in particulate matter pollution and operational equipment such as compressor stations and dehydrators contribute hazardous air pollutants, nitrogen oxides, sulfur dioxide, carbon monoxide, and volatile organic compounds) (excerpts attached as Exh. 28); Moab RMP Air Quality Support Document (excerpts attached as Exh. 29).

Congress has developed national ambient air quality standards (NAAQS) for these pollutants because they have a significant effect on public health.  *See, e.g.*, 42 U.S.C. §§ 7408, 7409; 40 C.F.R. §§ 50.4 – 50.13.  Not only are air pollutants associated with oil and gas development harmful to human health, they also destroy vegetation and create haze that mars scenic vistas. *See, e.g.*, Exh. 4 at 4-13 to -19, 4-24; 71 Fed. Reg. 2,620, 2,627-28 (Jan. 17, 2006); 73 Fed. Reg. 16,436 (Mar. 27, 2008); BLM, West

Tavaputs Plateau Natural Gas Full Field Development Plan, Draft Environmental Impact

Statement 3-18 (Feb. 2008) (West Tavaputs DEIS) (excerpts attached as Exh. 30).

One of the biggest air quality problems associated with oil and gas development is

ground-level ozone.  Ozone exposure can lead to adverse health effects in humans

ranging from decreased lung function to possible cardiovascular-related mortality and

respiratory morbidity.  73 Fed. Reg. at 16,436.  Ozone pollution also "contributes to plant

and ecosystem damage."  Exh. 30 at 3-18.  It damages trees and other plants thereby

affecting landscapes in national parks, among other places.[11]

Ground-level ozone is formed from precursor emissions—volatile organic

compounds (VOCs) and nitrogen oxides ($NO_X$)—and its concentrations are affected by

temperature, sunlight, wind, and other weather factors.  *See* 73 Fed. Reg. at 16,437.

These precursor emissions originate from a wide variety of sources, both mobile and

stationary.  *Id.*  During oil and gas development, ozone precursors are emitted from

construction and maintenance vehicles, glycol dehydrators, compressors and flaring of

gas.  *See* Exh. 2 at 4-17 to -18, 4-27 to -28; Letter from Larry Svoboda, EPA, to Brent

Northrup, BLM Moab Field Office 2 (Sept. 12, 2008) (attached as Exh. 31).  EPA has

notified BLM of its concerns that ozone emissions will increase due to current oil and gas

development in Utah.  *See* Letter from Larry Svoboda, EPA, to Selma Sierra, BLM

Vernal Field Office 2 (Sept. 23, 2008) (attached as Exh. 32); Letter from Larry Svoboda,

EPA, to Selma Sierra, BLM Price Field Office 3 (Oct. 2, 2008) (attached as Exh. 33).

Indeed, ozone pollution is already a problem in several national parks, which are

specially-protected "Class I areas" under the Clean Air Act.  Among other standards, the

---

[11] *See* EPA, Ozone – Good Up High, Bad Nearby (Feb. 12, 2008)
http://www.epa.gov/oar/oaqps/gooduphigh/bad.html.

Act seeks to protect the "air quality related values" (AQRVs) of Class I areas.  *See* 42 U.S.C. § 7475(d)(1)(B).[12]  In 2008, Canyonlands National Park recorded ozone levels right at the NAAQS limit: 0.075 parts per million.  Exh. 23 at 2; *see also* Exh. 2 at 4-507.  Likewise, 2008 monitoring in Dinosaur National Monument recorded ozone levels at 0.069 parts per million, which is very close to the NAAQS limit.  *See* Exh. 23 at 2.  BLM also recently released an environmental analysis of a full field natural gas development project in the Price district predicting that oil and gas development in that area *would exceed* NAAQS for ozone.  *See* Letter from Robert E. Roberts, EPA, to Selma Sierra, BLM 3 (May 23, 2008) (EPA West Tavaputs Letter) (attached as Exh. 34).  Oil and gas development has contributed to these high ozone levels in Utah's parks and monuments and additional development will only exacerbate this pollution.  *See, e.g.*, Exh. 2 at 3-12.

### 2.   The FEISs for the Moab, Vernal, and Price RMPs fail to analyze and disclose significant air pollution issues.

To comply with NEPA's "hard look" requirement, BLM must explain how its actions will or will not comply with environmental laws and policies.  40 C.F.R. § 1502.2(d) ("Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of [NEPA] *and* other environmental laws and policies." (emphasis added)); *see also id.* § 1508.27(b) (stating federal agencies must consider "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment").  In fact, FLPMA requires BLM to ensure that its approval of oil and gas development complies with all applicable air quality standards.  43 U.S.C. § 1712(c)(8) (requiring

---

[12] Both Arches and Canyonlands have identified AQRVs within their boundaries that are harmed by ozone pollution (*e.g.* sensitive vegetation).  *See* NPS, Arches National Park AQRV's, http://www.nature.nps.gov/air/Permits/ARIS/arch/aqrv.cfm; NPS, Canyonlands National Park AQRV's, http://www.nature.nps.gov/air/Permits/ARIS/cany/aqrv.cfm.

BLM to "provide for compliance with applicable pollution control laws, including State and Federal air … pollution standards" ); 43 C.F.R. § 2920.7(b)(3) (requiring that BLM "land use authorizations shall contain terms and conditions which shall … [r]equire compliance with *air … quality standards* established pursuant to applicable Federal or State law") (emphasis added).  Accordingly, BLM must analyze air emissions associated with oil and gas development, and determine whether those emissions will result in violations of federal air quality standards.

Further, in analyzing the air quality impacts of its actions under NEPA, BLM must pay special attention to the following factors:

> (2) The degree to which the proposed action affects *public health or safety*.

> (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, *park lands*, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

40 C.F.R. § 1508.27(b) (emphasis added).  BLM must therefore determine whether air emissions will harm public health—which in the air pollution context is governed by Clean Air Act standards, such as NAAQS—or will impact the special resources of Arches National Park, Canyonlands National Park, and Dinosaur National Monument.

BLM must also support its conclusions about environmental impacts with adequate evidence in the record.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.*, 463 U.S. 29, 43 (1983); *Izaak Walton League of America v. Marsh*, 655 F.2d 346, 368-69 (D.C. Cir. 1981).  This evidence should include "the best available scientific information."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *see also* 40 C.F.R. § 1502.24 ("Agencies shall insure the professional integrity, including

scientific integrity, of the discussions and analyses in environmental impact statements.").

Therefore, prior to selling oil and gas leases, BLM must thoroughly analyze whether air pollution from the oil and gas development authorized will exceed relevant air quality standards or have adverse impacts on public health or national parks and must support its conclusions with relevant evidence. BLM has not done so.

          **a.**        **The FEISs for the Moab and Price RMPs fail to consider whether federal air quality standards will be met.**

The Moab and Price RMPs fail to determine whether federal air quality standards—in particular NAAQS—will be met because they include no quantitative analysis (modeling).[13]   Although both RMPs concede that oil and gas development will increase air pollution, including pollutants subject to NAAQS standards such as particulate matter, sulfur dioxide, and nitrogen oxides, they have not considered how that pollution will concentrate or disperse in the atmosphere. *See* Exh. 3 at 4-4 to -5; Exh. 2 at 4-10, 4-16, 4-32. Yet, both RMPs summarily conclude that federal Clean Air Act standards will not be violated. *See* Exh. 3 at 4-8 ("[I]it is expected that the increase in emissions … for the Proposed RMP would not cause any … federal ambient air quality standards to be exceeded."); Exh. 2 at 4-16 (stating that management decisions specific to oil and gas development "are not projected to generate emissions sufficient to result in noncompliance with air quality criteria").

However, without modeling to determine the ambient concentrations of pollutants, BLM cannot ensure NAAQS will be met. This is because NAAQS are

---

[13] Quantitative modeling refers to the process of predicting ambient concentrations of a given pollutant in an area using computer models that consider emission rates, weather, and topography, among other factors.

expressed and violations determined from the *concentration* of pollution in the air.  *See, e.g.*, 42 U.S.C. § 7409 (creating NAAQS to protect public health and welfare from the "presence of … air pollutant[s] in the ambient air"); 40 C.F.R. §§ 50.1(1), 50.4 – 50.13 (containing NAAQS—and exceedance guidelines—for sulfur dioxide, particulate matter, carbon monoxide, ozone, lead, and nitrogen dioxide, all of which are expressed in ambient concentrations).  Without knowing what those concentrations are and where they occur, BLM simply cannot assess whether authorized oil and gas development will meet federal standards and therefore whether public health will be effected.  Indeed, the Price RMP acknowledges that it contains only a qualitative air analysis and as a result "specific impacts … cannot be determined."  *See* Exh. 3 at 4-4.  Therefore, there is no support for BLM's conclusion that federal standards will be met, and BLM has failed to adequately analyze the impacts of oil and gas development on human health.

The National Park Service pointed out that BLM's air analysis was deficient in a November 24, 2008 letter, and specifically noted that the lack of modeling prevented BLM from adequately assessing impacts to national parks:

> The air quality analyses that BLM has performed to date do not provide the information necessary to determine whether air quality standards could be violated, or if visibility and other AQRVs could be adversely impacted. We believe a study using appropriate air quality models, and considering all other regional sources, needs to be done prior to lease offerings to determine whether additional safeguards are needed to keep the area as attainment and protect AQRVs.

Exh. 23 at 2.  Although the Park Service offered its own air quality experts to assist in modeling, BLM ignored this offer.  *Id.*  BLM's decision to ignore the ambient concentrations of federally regulated pollutants violates its obligation under NEPA to take a hard look at environmental impacts to national parks.  *See* 40 C.F.R. § 1508.27(b).

BLM attempts to explain away its failure to model air emissions by arguing that such analysis is too difficult to perform until a specific proposal has been received by BLM.  *See* Director's Protest Resolution Report, Moab RMP at 44-45 (attached as Exh. 57);  Director's Protest Resolution Report, Price RMP at 45-46 (attached as Exh. 42). Not only does this violate this Circuit's precedent in *Sierra Club v. Peterson*, *see* 717 F.2d at 1414-15, requiring federal agencies to consider the environmental impacts *prior* to leasing, but it is unsupported as a factual matter.  Indeed, that BLM prepared such modeling—flawed as it may be—for the Vernal RMP directly refutes this argument.  *See, e.g.*, Exh.4 at 4-20 to -21.  BLM has also prepared quantitative modeling for the Farmington, New Mexico RMP and the Roan Plateau, Colorado RMP.  SUWA *et al.* Protest of the Dec. 2008 Lease Sale at 98 (Dec. 4, 2008) (attached as Exh. 35). Therefore, BLM cannot reasonably claim that air quantitative modeling is impossible at the RMP stage.

### b.     The FEISs for the Moab, Vernal, and Price RMPs ignore ozone pollution.

The Moab, Vernal, and Price FEISs also ignore the impacts of ozone pollution in violation of NEPA.  The Price RMP lacks any discussion, analysis, or modeling of potential ozone impacts from oil and gas development or any other activities in the Price field office.  *See* Exh. 3 at 4-4 to -8 (lacking even the word "ozone").  The Moab and Vernal RMPs fail to quantify or model ozone pollution from oil and gas development or any other activities.  *See* Exh. 2 at 4-13 to -33, 4-507 (suggesting that ozone concentrations would not be a problem but lack any modeling to prove this); Exh. 32 at 2. In the case of the Moab RMP, BLM admitted that cumulative impacts could lead to "slight increases" of ozone precursors which would "further impact air quality at …

19

Canyonlands National Park … and threaten to push the area into non-compliance with NAAQS." Exh. 2 at 4-507.

As BLM recognized, however, "[p]redicting ozone associated with oil and gas development requires air dispersion modeling." BLM, Response to Public Comments, Comments on the [Moab] Draft EIS by Resource Type 70 (attached as Exh. 36). Hence, without quantifying and modeling emissions, BLM cannot determine whether federal standards designed to protect public health will be met or what the impacts will be to national parks and monuments. This analysis is particularly important because the December Lease Sale authorizes oil and gas development near areas that are already experiencing ozone pollution that is approaching or at federal standards, such as Canyonlands National Park and Dinosaur National Monument. *See* Exh. 32 at 2; Exh. 33 at 2. Indeed, the RMPs open millions of acres to oil and gas development within these areas. That development will invariably worsen Utah's ozone problems. *See, e.g.*, Exh. 2 at 4-507 (admitting that oil and gas would increase ozone levels).

In fact, EPA—the federal agency charged with regulating ozone under the Clean Air Act—repeatedly expressed its concern about BLM's failure to consider ozone pollution. *See* Exh. 31 at 1-2 ("Ozone is of particular concern); Exh. 33 at 3 ("EPA is concerned that the analysis in the [Price RMP] underestimates the potential for the ozone concentrations to exceed the NAAQS."); Exh. 32 at 2 ("EPA is concerned that the BLM did not conduct an analysis of impacts on ozone levels in the Vernal RMP/EIS."). The EPA went so far as to state that ozone precursor emissions in the Price Field Office "could result in ozone concentrations near or potentially above the ozone NAAQS."

Exh. 33 at 2.  And it warned that monitoring in the Vernal Field Office showed that ozone concentrations "are near the limits" of NAAQS.  Exh. 32 at 2.

Despite BLM's admission that ozone prediction "requires air dispersion modeling," the agency has refused to conduct the proper analysis under NEPA.  *See* Exh. 36.  BLM offers no explanation as to why such analysis could not have taken place before the approval of the Price and Vernal RMPs or before the agency issues oil and gas leases.  Indeed, the Price and Vernal field offices allege no lack of knowledge or technical capability.[14]

Instead, BLM attempts to rely on NEPA documents that have yet to be completed (and may never be completed) to satisfy its legal obligations:  the Uinta Basin Air Quality Study and the White River RMP Amendment/Oil and Gas EIS.  *See* BLM, Response to Public Comments, Comments on the [Vernal] Draft RMP/EIS by Resource 65 (excerpts attached as Exh. 37); BLM, Public Comments and Responses – Price Draft RMP/EIS – July 2004, Sorted by Category 389 (excerpts attached as Exh. 38).  BLM does not even know the outcome of these studies.  Indeed, they could find that oil and gas leasing will cause violations of NAAQS in violation of FLPMA.  43 U.S.C. § 1712(c)(8); 43 C.F.R. § 2920.7(b)(3).[15]  This decision to lease now and think later violates NEPA.  *See Peterson*, 717 F.2d at 1414-15.

---

[14] While the Moab RMP asserts that it lacked the site-specific information necessary to prepare ozone modeling, this argument is refuted by the fact that the RMP itself makes lands available for leasing.  *See* Exh. 2 at 4-507.  At a minimum, however, such analysis must be undertaken when the agency decides to lease parcels without no surface occupancy stipulations.  *See Peterson*, 717 F.2d at 1414-15.

[15] Furthermore, the Uinta Basin Air Quality Study has been extensively criticized, by both the EPA and the public, for its methodology, lack of consultation with the public, its failure to consider non-oil and gas contributions to ozone, and its control by an oil and gas industry group.  *See* Exh.33 at 2; Exh. 32 at 2; Exh. 35 at 27-28.

**B.      The FEISs for the Moab, Vernal, and Price RMPs Violate NEPA by Ignoring the Cumulative Impacts of Oil and Gas Development and Motor Vehicle Use Authorized in the Travel Management Plans.**

NEPA requires that BLM evaluate the direct, indirect, and cumulative impacts of federal actions. *See* 40 C.F.R. § 1508.25(c). The Council on Environmental Quality (CEQ) has recognized that "the most devastating environmental effects may result not from the direct effects of a particular action, but from the combination of individual minor effects of multiple actions over time." CEQ, Considering Cumulative Effects Under the National Environmental Policy Act 1 (January 1997) (excerpts attached as Exh. 39). CEQ regulations define cumulative impacts as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

*Id.* § 1508.7; *see also Grand Canyon Trust v. FAA,* 290 F.3d 339, 342 (D.C. Cir. 2002) (stating that an environmental analysis "must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum"). NEPA requires that an agency's cumulative impacts analysis provide "quantified or detailed information." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372,1379, (9th Cir. 1998); *see also Natural Res. Def. Council v. Hodel*, 865 F.2d 288, 299 (D.C. Cir. 1988) ("[P]erfunctory references do not constitute analysis useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts.").

BLM failed to analyze and consider the cumulative impacts to air quality from oil and gas leasing and off-road and other motor vehicle use authorized in Motor Vehicle Travel Plans for the Moab, Price, and Vernal RMPs.

> **1.     Motor vehicle use on dirt roads in Utah leads to significant particulate pollution.**

In arid Utah, travel by motor vehicles, including trucks and off-road vehicles, on dirt roads generates a significant amount of dust.  In addition, the vehicles themselves produce emissions (e.g. tailpipe emissions).  *See, e.g.*, Exh. 35 at 79 (referencing EPA guidelines for calculating these emissions); Exh. 3 at 4-5 (stating that off-highway vehicle use and truck traffic on unpaved roads creates dust and vehicle emissions).

This dust, or fugitive dust as it is called, is a type of particulate matter pollution. *See, e.g.*, Exh. 3 at 3-8, 4-5; Exh. 2 at 4-507.  Particulate matter pollution is regulated by the Clean Air Act's NAAQS program; EPA differentiates these particulates by size, referring to fine particulates as "$PM_{2.5}$" and coarser particulates as "$PM_{10}$."[16]  *See* 40 C.F.R. §§ 50.6, 50.7.  Both short-term and long-term exposure to fine particles can lead to premature mortality, increased hospital admissions, and chronic respiratory disease. *See* 71 Fed. Reg. at 2,627-28.  These particles also create regional haze, thereby impairing visibility.  *See* Exh. 4 at 4-24.

Fugitive dust from vehicular travel is a significant health and environmental issue. EPA told BLM in its comments on the Price RMP that "[f]ugitive dust conditions on … county roads may approach the NAAQS for particulate matter."  Exh. 33 at 8.  In an oil and gas project recently approved by the Vernal field office, levels of $PM_{2.5}$—principally from fugitive dust emissions from truck traffic—were projected to be high enough to

---

[16] The numbers refer to particles 2.5 and 10 microns in diameter or smaller, respectively.

exceed NAAQS.  *See* Exh. 35 at 80 (citing to air quality modeling in the Buys &

Associates, Inc., *Rock House Emissions Inventory* for Enduring Resources' Saddletree

Draw Leasing and Rock House Development Proposal, Final Environmental Assessment

UT-080-07-671 (Dec. 2007)).  BLM's analysis for a recently proposed 800-well oil and

gas development project in the Price Field Office determined that particulate matter

pollution caused in large part by fugitive dust from truck traffic on unpaved roads was

projected to be the major pollutant during oil and gas development activities.  *See id.*

Although the latter two examples refer to fugitive dust from truck traffic for oil and gas

development, any vehicular traffic (such as recreational traffic) would have the same

result.  *See, e.g.*, *id.* at 40-41, 79-80.

> ## 2.    BLM failed to consider the cumulative dust emissions from oil and gas development and other motor vehicle use.

The Moab, Vernal, and Price RMPs and the December Lease Sale authorize oil

and gas development that will increase particulate pollution.  Construction and

maintenance of oil and gas operations leads to tremendous increases in truck travel on

dirt roads.  These RMPs also authorize significant motor vehicle use.  The Records of

Decision (RODs) for each RMP approve "travel management plans" that specifically

designate routes that are open to off-road vehicles.  *See* Moab ROD at 18 (excerpts

attached as Exh. 58); Price ROD at 24 (excerpts attached as Exh. 59); Vernal ROD at 22

(excerpts attached as Exh. 60).  As there is no further site-specific approval necessary to

implement these travel plans, the FEISs for the RMPs are the only environmental analysis

BLM will conduct before motor vehicle use is authorized.[17]  Therefore, like the leases,

the travel management plans represent an "irreversible or irretrievable" commitment of

---

[17] These records of decision are clear that motor vehicle area and route designations made in the RMPs are "effective upon issuance" of that document.  *See, e.g.*, Moab ROD at 18 (see Exh. 58).

resources.  *Peterson*, 717 F.2d at 1414.  Despite this commitment of resources, BLM

never looked at the cumulative pollution caused by oil and gas development motor

vehicle authorized under the travel management plans.

The Moab, Vernal, and Price FEISs fail to consider the ambient concentrations of

fugitive dust emissions from the authorized motor vehicle use, let alone the

concentrations in combination with oil and gas development.  Indeed, BLM stated in the

Price RMP that "[a]ir quality emissions were not considered in Travel Plan decisions

within the Draft RMP/EIS or the Proposed RMP/Final EIS."  BLM, Public Comments

and Responses – Price Draft RMP/EIS WC Supplement – September 2007, Sorted by

Category 8 (excerpts attached as Exh. 40).  However, Plaintiffs provided BLM with

detailed information on how the agency could estimate emissions and prepare modeling

for vehicle travel on unpaved roads and the vehicle emissions themselves.  *See, e.g.*, Exh.

35 at 40-41, 79-80, 96-98.  Indeed, these procedures are familiar to BLM as they have

been applied in other BLM-prepared environmental analyses.  *See, e.g.*, *id.*  Yet, BLM

ignored this available scientific information in violation of NEPA.  *See Robertson,* 490

U.S. at 350.

BLM's refusal to undertake a cumulative impacts analysis of the air impacts of oil

and gas development and motor vehicle use means BLM does not know whether it has

authorized activities that will result in exceedances of federal air quality standards

thereby affecting public health.  Nor has BLM provided "quantified or detailed

information" about cumulative impacts.  *Neighbors of Cuddy Mountain*, 137 F.3d at

1379.  Accordingly, the FEISs for Vernal, Price, and Moab RMPs violate NEPA.

II.   **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT BLM FAILED TO COMPLY WITH NEPA AND INTERIOR SECRETARY ORDER NO. 3226 BY IGNORING CLIMATE CHANGE.**

All three of the RMPs/FEISs at issue here ignored one of the most critical issues facing the management of BLM lands in Utah:  the impacts of climate change.  The Supreme Court recently acknowledged that "[t]he harms associated with climate change are serious and well recognized."  *Massachusetts v. EPA*, 127 S. Ct. 1438, 1455 (2007). Indeed, the best scientific evidence available shows that climate change is a real and compelling threat to public lands.  *See, e.g.,* IPCC, Climate Change 2001: Working Group II: Impacts, Adaptations, and Vulnerability, Exec. Summary 1 (Nov. 16, 2007) (excerpts attached as Exh. 41) (finding that "modeling studies continue to show the potential for significant disruption of ecosystems under climate change").

The challenged RMPs make land use decisions for 7 million acres of public lands that will be greatly affected by climate change.  Under NEPA and Interior Secretary Order No. 3226, BLM must consider what the changing climate means with respect to the environmental impacts of these decisions.[18]  Under NEPA, BLM must adequately and

---

[18] This analysis is crucial in this case because the RMPs authorize activities, such as oil and gas development, that are major contributors of greenhouse gases and in combination with other past, present, and reasonably foreseeable actions will have an impact on climate change.  *See Center for Biological Diversity v. National Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008) (rejecting a federal agency's environmental analysis of the impact of new fuel standards for failing to consider the "incremental impact" of the fuel standards on climate change "in light of other past, present and reasonably foreseeable actions"); *see also Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520 (8th Cir. 2003) (holding that increased coal consumption and global warming emissions were reasonably foreseeable effects of railroad expansion to transport coal and must be considered in a NEPA document).  The Moab, Price, and Vernal RMPs open millions of acres to oil and gas development and predict over 8,000 new oil and gas wells in the lifetime of the plans.  Exh. 4 at 4-137 (predicting 6,284 wells in Vernal planning area); Exh. 2 at 4-16, 4-17 (predicting 1,050 wells in Moab planning area); Exh. 3 at 2-168, 4-19 (predicting 1,900 wells in Price planning area).  Development and operation of these wells will lead to significant emissions of greenhouse gases, including carbon dioxide, methane, and to a lesser extent nitrous oxide.  *See* American Petroleum Institute, Compendium of Greenhouse Gas Emissions Methodologies for the Oil and Gas Industry, at 2-5 (Feb. 2004), *available at* http://www.api.org/ehs/climate/new/upload/2004_COMPENDIUM.pdf (last visited Dec. 15, 2008).

accurately describe the environment that will be affected by the proposed action—the "affected environment." 40 C.F.R. § 1502.15. This includes the affected environment as modified by climate change. *Cf. Natural Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 367-70 (E.D. Cal. 2007) ("FWS acted arbitrarily and capriciously by failing to address the issue of climate change in the biological opinion. This absence of *any* discussion in the biological opinion of how to deal with any climate change is a failure to analyze a potentially 'important aspect of the problem.'"). Indeed, Interior Secretary Order No. 3226 specifically requires BLM to "consider and analyze potential climate change impacts" when undertaking long-range planning exercises, including specifically "management plans and activities developed for public lands." Interior Sec'y Order No. 3226 (attached as Exhibit 43).[19] This Order is enforceable, *see Hopi Tribe v. Watt*, 530 F. Supp. 1217, 1229 (D. Ariz. 1982), and has been applied by BLM's sister agencies the National Park Service[20] and the Fish and Wildlife Service.[21]

     In direct defiance of NEPA and Order No. 3226, BLM did not conduct any analysis of the effects of climate change on the lands managed under the Moab, Price, and Vernal RMPs or incorporate such analysis into the consideration of management alternatives. These RMPs are intended to govern management of these lands for decades,

---

[19] By its terms the "Order is effective immediately and will remain in effect until its provisions are converted to the Departmental Manual or until it is amended, superseded or revoked, whichever comes first." Exh. 43 § 4.

[20] *See* GAO Report to Congressional Requesters, Climate Change, Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources, at 37–38 (Aug. 2007), *available at* http://www.gao.gov/new/items/d07863.pdf (last visited Dec. 15, 2008).

[21] *See, e.g.*, Upper Mississippi river Refuge FEIS/Comprehensive Conservation Plan, at Appendix D, Applicable Laws and Orders, *available at* http://www.fws.gov/Midwest/Planning/uppermiss/feis/AppendixD.pdf (last visited Dec. 15, 2008); Draft Comprehensive Conservation Plan and Environmental Assessment, Rainwater Basin Management District, Nebraska (2007), *available at* http://www.fws.gov/mountain-prairie/ planning/states/Nebraska/rwb/rwbccp_draft_ch4.pdf (last visited Dec. 15, 2008).

and the bulk of scientific information predicts substantial changes occurring as part of climate change in that timeframe.  Government and university studies predict that Utah will get even hotter, water will become more scarce, native plant and animal life will suffer, and wildfires will become larger and hotter.  *See, e.g.*, SUWA *et al.* Comments, Moab DRMP/DEIS 41–50 (Nov. 17, 2007) (excerpts attached as Exh. 44); SUWA *et al.* Protest of the Moab PRMP/FEIS at 17-27 (Sept. 2, 2008) (attached as Exh. 45).

Activities authorized under the RMPs—such as oil and gas development and road building—will only exacerbate these negative effects.  Plaintiffs' comments on the Moab DRMP/DEIS and its protests of all three PRMPs/FEISs provided specific information about recently-published federal studies discussing the impacts of climate change on public lands typical of those found within the three RMPs.  *See, e.g.*, Exh. 44 at 41–50; Exh. 45 at 17-27.  These studies show that soil disturbing activities in particular, *including those relating to energy exploration and development*, put plant and animal species, and key wildlife habitats like riparian areas, at heightened risk to the effects of climate change.  *See* U.S. Climate Change Science Program, *The Effects of Climate Change of Agriculture, Land Resources, Water Resources, and Biodiversity in the United States*, Synthesis and Assessment Product 4.3 (June 2008) (excerpts attached as Exh. 46). EPA also criticized the RMPs for their failure to analyze the effects of approved oil and gas development on climate change, and their failure to consider needed adaptation to the effects of climate change on public lands.  *See, e.g.*, Exh. 31.  Indeed, without analyzing basic information about the existing and future expected impacts of climate change on the public lands, BLM cannot make informed decisions about the level, location and kind of activities the land and its ecosystems can support in the future (*e.g.* thousands of new oil

and gas wells and the accompanying miles of roads, pipelines and other development).

Accordingly, BLM's failure to analyze climate change as part of its land use planning

process violates NEPA and Order No. 3226.

BLM claims it cannot analyze the impacts of climate change due to lack of tools

for quantification, including a lack of guidance from EPA.  *See, e.g.,* Director's Protest

Resolution Report for Price RMP, at 48 (Oct. 29, 2008) (attached as Exh. 42).  However,

EPA rejected that argument, recognizing that "NEPA requires federal agencies to take a

hard look at potential environmental impacts associated with their proposed actions" and

the "[l]ack of regulatory protocol or emission standards for greenhouse gases does not

preclude BLM from fulfilling this responsibility."  Exh. 33.  Indeed,"[r]easonable

forecasting . . . is . . . implicit in NEPA, and [the courts] must reject any attempt by

agencies to shirk their responsibilities under NEPA by labeling any and all discussions of

future environmental effects as 'crystal ball inquiry.'"  *Dubois v. U.S. Dep't of Agric.*,

102 F.3d 1273, 1286 (1st Cir. 1996) (quoting *Scientists Inst. for Pub. Info v. Atomic

Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973)).  Therefore, BLM cannot be

allowed to shirk its obligations under NEPA to analyze the impacts of climate change.

## III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT BLM FAILED TO COMPLY WITH THE NHPA.

The pre-leasing analysis conducted by the Price and Vernal field offices does not

satisfy the requirements of the NHPA and its implementing regulations.  16 U.S.C. §§

470f, 470h-2(a).  Specifically, BLM's conclusion that historic properties in the Nine Mile

Canyon region would not be affected by the December 19, 2008 lease sale was arbitrary

and capricious.[22]

### A.      Oil and Gas Leasing is an Undertaking Under Section 106 of the NHPA.

It is settled law that issuing oil and gas leases constitutes an undertaking requiring prior compliance with Section 106 of the NHPA.  To determine whether a proposed action is an undertaking, federal agencies must conduct a two-part analysis.  36 C.F.R. § 800.3(a); *Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1152 (D. Mont. 2004).  First, an agency must establish whether the proposed action is "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . [one] requiring a Federal permit, license, or approval."  16 U.S.C. § 470w(7); 36 C.F.R. § 800.3(a).  Second, the agency must determine whether the undertaking is a type of activity that has the "potential to cause effects on historic properties."  36 C.F.R. § 800.3(a).  Courts have consistently recognized that issuing oil and gas leases satisfies both of these steps.  *Mont. Wilderness Ass'n.*, 310 F. Supp. 2d at 1152-53 (rejecting BLM's contention that the sale of oil and gas leases are not undertakings); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 459 F. Supp. 2d 1102, 1125 (D.N.M. 2006) (ordering BLM to complete Section 106 consultation at the leasing stage).

Even leases offered with resource protective stipulations require compliance with Section 106 because the stipulations typically apply only to historic properties within the leased parcels, "meaning that nearby [properties] will not be protected."  *New Mexico ex rel. Richardson*, 459 F. Supp. 2d at 1125 n.19; *see also Mont. Wilderness Ass'n*, 310 F.

---

[22] Plaintiffs' NHPA claims apply solely to twenty parcels located in the Price and Vernal field offices the development of which may require access through Nine Mile Canyon (UT1108-83, UT1108-84, UT1108-87, UT1108-328, UT1108-330, UT1108-331, UT1108-332, UT1108-335, UT1108-337, UT1108-338, UT1108-339, UT1108-340, UT1108-341, UT1108-342, UT1108-343, UT1108-345, UT1108-348, UT1108-349, UT1108-350, and UT1108-355).

Supp. 2d at 1152 ("Lease stipulations . . . cannot replace the BLM's duties under NHPA.").  Furthermore, a unilateral determination by BLM to include safeguards or mitigation measures in a lease cannot satisfy the consultation requirements of Section 106.  *Attakai v. United States*, 746 F. Supp. 1395, 1407–08 (D. Ariz. 1990).

> **B.     BLM Failed to Comply with the Section 106 Consultation Process.**

The Section 106 process requires federal agencies to: "make a reasonable and good faith effort" to identify historic properties within the defined "area of potential effects (APE)," 36 C.F.R. § 800.4(b)(1); evaluate the eligibility of historic properties within the APE for the National Register*, id.* § 800.4(c); assess any effects the undertaking may have on historic properties, *id.* § 800.5; and if the effects are adverse, develop and evaluate alternatives or modifications to the project to avoid, minimize, or mitigate those effects based on consultation with the SHPO, Indian tribes, the Advisory Council on Historic Preservation, and other consulting parties*, id.* § 800.6(a).  These steps must be completed "prior to" approval of an undertaking.  16 U.S.C. § 470f.

 Additionally, federal agencies must identify and include consulting parties in the Section 106 process, 36 C.F.R. § 800.3(f), and seek public comment and input in the Section 106 process, *id.* § 800.2(d).  *See Mid States Coalition for Progress v. Surface Transp. Brd.,* 345 F.3d 520, 553 (8th Cir. 2003) (an agency has both a general duty to involve the public and a duty to seek consulting parties to be more formally involved).  Consulting parties play an integral role, helping to identify potentially affected historic properties and to develop and evaluate alternatives and modifications to the project in order to avoid, mitigate, and minimize adverse effects to historic properties.  *See id.* §§ 800.4(a)(3), (4)(b), 800.6(a).  The regulations also provide consulting parties with the

right to formally review agency effect findings and to raise objections to those findings.

*Id.* §§ 800.4(d)(1), 800.5(c)(2)(i).  BLM has not adequately completed these steps.

> **1.     The area of potential effects for the proposed leases is arbitrarily narrow and excludes potentially affected historic properties in Nine Mile Canyon.**

Determination of the APE is a critical step in the Section 106 process because the

APE establishes the area in which effects of the proposed undertaking must be

considered.  The Section 106 regulations define the APE broadly to include "the

geographic area or areas within which an undertaking may directly or indirectly cause

alterations in the character or use of historic properties."  36 C.F.R. § 800.16(d); *see also*

*Colo. River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1437 (C.D. Cal 1985) (rejecting

use of a project's "permit area" as the APE for Section 106 consultation).  For oil and gas

lease sales, BLM cannot simply draw an APE around the boundaries of the parcels

because effects on historic properties may occur outside of those areas.  *New Mexico ex*

*rel. Richardson*, 459 F. Supp. 2d at 1125 n.19; *see also Wilson v. Block*, 708 F.2d 735,

754 (D.C. Cir. 1983) (upholding APE determination that included a project's access

road).  Yet this is precisely what BLM had done in this case.  Exh. 25 at 4; Exh. 26 at 4.

In doing so, BLM excluded from the APE the areas in Nine Mile Canyon where

industrial traffic may affect historic properties.

"Nine Mile Canyon has often been described as the longest outdoor art gallery in

the world and is internationally recognized for its substantial concentration of prehistoric

archeological sites and renowned rock art panels."  Exh. 30 at 3-129 (internal quotations

omitted).  Nine Mile Canyon has over 1,000 historic and archaeological sites.  BLM,

FONSI and Decision Record, West Tavaputs Plateau Drilling Program, Carbon and

Duchesne Counties, Utah, Environmental Assessment UT-070-2004-28, at 6 (July 29,

2004) (attached as Exh. 47).  Rock art comprises 75 to 80% of these sites, while the

remaining sites consist of "cliff dwellings, masonry granaries, slab storage cists, semi-

subterranean pit houses, retaining walls, and modified natural features such as rock

shelters and ledge overhangs."  *Id.*

Over the last six years, natural gas development has increased dramatically near

Nine Mile Canyon.  Exh. 30 at 3-71 (describing recent spike in the approval of drilling

permits on the West Tavaputs Plateau).  Because the dirt road in Nine Mile Canyon

provides the primary access route to drilling sites on the West Tavaputs Plateau, truck

traffic in the canyon has also increased significantly in recent years.  *Id.* Appendix G at 1.

These heightened levels of industrial traffic generate plumes of dust that are settling on

and diminishing the clarity of rock art, in particular those panels located adjacent to the

canyon's road.  *Id.* at 4-219.

Recently, BLM commissioned a study to examine the impacts of dust on Nine

Mile Canyon's rock art sites.  *Id.* Appendix G at 2.  The study's interim report concluded

that certain

> sections of road in Nine Mile Canyon are generating large amounts of dust
> as industrial traffic passes.  These particulates are very fine and . . . are the
> most dangerous for cultural property for many reasons, including their
> ability to remain in the air until they find a surface upon which to settle.
> In the case of Nine Mile Canyon, that surface can be a rock-art panel.

*Id.* at 30.  Additional findings by BLM also indicate that industrial traffic associated with

the development of federal oil and gas leases has a negative effect on historic properties

in Nine Mile Canyon.  *See* Exh. 3 at 4-349 (stating that the impacts of industrial traffic on

cultural resources in Nine Mile Canyon will continue during implementation of the Price

RMP).  The lease sale parcels requiring access through Nine Mile Canyon would

exacerbate this harm.

The Hopi Tribe's letter of November 24, 2008 provides further evidence that BLM arbitrarily excluded portions of Nine Mile Canyon from the APE. According to this letter, the Hopi Tribe "consider[s] any additional industrial traffic on the Nine Mile Canyon road to be an adverse effect on cultural resources significant to the Hopi Tribe" and "the sale of any parcel that is accessed by the Nine Mile Canyon road to be an adverse effect on cultural resources significant to the Hopi Tribe." Letter from Leigh J. Kuwanwisiwma, Director, Hopi Cultural Preservation Officer, to Michael Stiewig, Acting Field Office Manager, Price Field Office (Nov. 24, 2008) (attached as Exh. 48). The record contains no evidence that BLM made a "reasonable and good faith effort" to consult with the Hopi Tribe over the APE or its belief that the lease sale will adversely affect properties of cultural significance to the tribe. *See* 16 U.S.C. §§ 470a(d)(6)(A), (B) (requiring tribal consultation over undertakings). In fact, the form letter sent by the Price Field Office to various Indian tribes prior to the lease sale lacks the agency's determination of effects for the sale, as required by the Section 106 regulations. 36 C.F.R. § 800.4(d)(1); *see also Pueblo of Sandia v. United States*, 50 F.3d 856, 860 (10th Cir. 1995) ("[A] mere request for information is not necessarily sufficient to constitute the 'reasonable effort' section 106 requires.").

As a direct result of the improperly defined APE, BLM failed to complete the other steps required by the Section 106 process, including consultation with Indian tribes and the public. *See* 36 C.F.R. §§ 800.2(d), 800.3(f). Therefore, this Court should set aside the arbitrary APE determination.

2.      **BLM's determination that the lease sale would have no effect on historic properties in Nine Mile Canyon is arbitrary and capricious.**

BLM arbitrarily concluded that the lease sale would not affect historic properties in Nine Mile Canyon.  Under the NHPA, the arbitrary and capricious standard of the APA governs agencies' determinations.  5 U.S.C. § 706(2)(A); *CTIA – The Wireless Ass'n v. Fed. Communications Comm'n*, 466 F.3d 105, 113 (D.C. Cir. 2006).  To comply with this standard, an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs.*, 463 U.S. at 43 (internal quotations omitted).  In this case, the record is replete with evidence, including BLM's own NEPA documents, showing that the lease sale will affect historic properties in Nine Mile Canyon.  Consequently, this Court must set aside the "no historic properties affected" determination in the Price and Vernal DNAs.

In the DNAs, BLM declared that the lease sale "may be viewed as a No Historic Properties Affected; eligible sites present, but not affected" type of undertaking.  Exh. 25 at 4; Exh. 26 at 4.  However, the cultural resource assessment prepared by BLM for the parcels within the Price Field Office directly contradicts this determination.  This assessment states that several parcels located on the West Tavaputs Plateau "are within the area effected [sic] by the west Tavaputs Gas Development.  Development of these parcels *would increase the cumulative adverse impact to cultural resources*."[23]  Letter

---

[23]   This finding is consistent with that posited by professional archaeologists with expertise in the archaeology of Nine Mile Canyon who have found that industrial traffic associated with natural gas projects on federal mineral leases is adversely affecting rock art in the canyon.  Letter from Jerry Spangler, Executive Director, Colorado Plateau Archaeological Alliance, to Brad Higdon, Planning and Environmental Coordinator, BLM 11 (Apr. 23, 2008) (archaeologist who has extensive familiarity with Nine Mile Canyon advising BLM that the dust and vibrations associated with industrial traffic constitutes an adverse effect) (attached as Exh. 49); Montgomery Archaeological Consultants, Cultural Resource

from Wayne Luddington, BLM to Lori Hunsaker, State Historic Preservation Officer, Re: Quarterly Log and Reports at unnumbered 5 (Dec. 5, 2008) (emphasis added) (attached as Exh. 51).[24]  This conclusion directly undermines BLM's conclusion in the DNA that "No Historic Properties [will be] Affected" by leasing.

Nor is the "no historic properties affected" determination consistent with recent statements by BLM that industrial traffic associated with federal oil and gas leases on the West Tavaputs Plateau affects historic properties in Nine Mile Canyon.  For example, in the West Tavaputs Draft EIS issued by BLM in February 2008, the agency stated that "[i]n Nine Mile Canyon, the combination of raw road surfaces and heavy vehicular traffic produces large plumes of fine dust that settle on the adjacent rock art," Exh. 30 Appendix G at 30–31, thus creating "a very serious conservation problem for the rock art of that specific panel." *Id.* at 5.  In August 2008, BLM made a similar finding in the Final EIS for the Price RMP and concluded that the "[i]mpacts from . . . vehicle traffic along the [Nine Mile Canyon] road (whether related to recreation or oil and gas maintenance) would continue" if BLM issued additional oil and gas leases that required access through the canyon.  Exh. 3 at 4-349.

Of course an agency may change course by conducting a "reasoned analysis" on the record.  *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 57.  "Unexplained inconsistency is,"

Inventory of Wasatch Oil and Gas Well Locations Prickly Pear #1215-11-2, #18-3, #19-2, and #27-3, in Nine Mile Canyon, Carbon County, Utah 20.21 (Aug. 2002) (identifying industrial traffic as a potential adverse effect. of natural gas development on the Nine Mile Canyon Archaeological District) (attached as Exh. 50).

[24]  BLM included  a different version of the cultural resource assessment as an attachment to the Price DNA.  *See* Price DNA.  The version in the DNA deleted the adverse effect determination for the West Tavaputs Plateau parcels included in the original version and instead stated that "[d]evelopment of these parcels *could* increase the cumulative adverse impacts to cultural resources."  *Id.* (emphasis added).  Yet even this watered down determination triggers the duty to consult since Section 106 applies to undertakings that *may* affect historic properties.  16 U.S.C. § 470f.  Regardless, the Price DNA is dated November 25, 2008 and the Price field office's letter to the SHPO with the "would" language in the cultural resources assessment is dated December 5, 2008 and reflects the agency's final word on the subject.

however, "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the [APA]." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). The record here contains no "reasoned analysis" explaining why BLM no longer chooses to endorse its February and August 2008 determinations that oil and gas leasing near Nine Mile Canyon affects historic properties. Consequently, the "no historic properties affected" determinations are arbitrary, capricious, an abuse of discretion, and contrary to law.

## IV.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

### A.   The Leases Commit BLM to Environmentally Destructive Oil and Gas Development.

As discussed above, the D.C. Circuit recognizes an oil and gas lease that does not prohibit all surface use constitutes as an "irreversible and irretrievable commitment of resources." *Peterson*, 717 F.2d at 1414 (quoting *Mobil Oil Corp. v. F.T.C.*, 562 F.2d 170, 173 (2d Cir. 1977)). For leases without NSO stipulations, BLM has authorized construction of roads, well pads, and pipelines at the leasing stage. *Id.* at 1414-15; 43 C.F.R. § 3101.1-2 ("A lessee shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold.") Once the lease is issued, BLM no longer has the authority to prevent some level of development. *Peterson*, 717 F.2d at 1415; *see also Connor v. Burford*, 848 F.2d at 1451 ("In sum, the sale of a[n] oil and gas lease [that does not prohibit surface use] constitutes the 'point of commitment;' after the lease is sold the government no longer has the ability to prohibit potentially significant inroads on the environment."); *California v. Watt*, 520 F. Supp. 1359, 1371 (C.D. Cal. 1981), *overruled on other ground by Secretary of the Interior v. California*, 464 U.S. 312 (1984)

("[L]easing sets in motion the entire chain of events which culminates in oil and gas development.").

In this case, BLM is poised to issue 80 leases covering approximately 110,000 acres that do not contain stipulations entirely prohibiting surface occupancy. Once BLM issues these leases, the companies that obtain the leases have a right to develop the surface somewhere on that lease. This development will include construction and maintenance of access roads, wells, drill pads, pipelines, compressor stations, and waste pits. These activities will increase air pollution in national parks, destroy the naturalness of wilderness quality lands, and harm irreplaceable cultural artifacts thereby irreparably harming Plaintiffs' members. *See* Declaration of Ray Bloxham (Exh. 12); Declaration of Liz Thomas (Exh. 11); Declaration of Bill Hedden (attached as Exh. 52); Declaration of Wayne Hoskisson (Exh. 13); Declaration of Karen Hevel-Mingo (attached as Exh. 53); Declaration of Steven C. Hansen (attached as Exh. 54). Indeed, the National Park Service raised concerns about the significant impacts to the air, water, and natural quiet of national parks. Exh. 23.

**B.      BLM's Failure to Adequately Analyze the Environmental Harm Resulting from the Leases Causes Irreparable Harm to Plaintiffs.**

Because leasing represents the crucial stage where BLM decides whether or not environmentally destructive development will occur, it is also the stage where BLM must analyze environmental impacts under NEPA. *Peterson*, 717 F.2d at 1415; *Connor*, 848 F.2d at 1451. NEPA protects the environment by requiring federal agencies to consider the environmental impacts of their actions *prior* to taking them. 42 U.S.C. §§ 4321, 4332. The Act's goal is to "ensure[] that important effects will not be overlooked . . . only to be discovered after resources have been committed or the die otherwise cast."

*Robertson*, 490 U.S. at 349.

As Judge—now Justice—Stephen Breyer held, where BLM plans to sell a mineral lease without first complying with NEPA, there is irreparable harm and a preliminary injunction is warranted. *Mass. v. Watt,* 716 F.2d 946 (1st Cir. 1983). Plaintiffs in *Massachusetts v. Watt* sought a preliminary injunction to stop an offshore oil and gas lease sale. The court held that BLM failed to comply with NEPA prior to the sale, and that a new EIS was required. The government responded that even if a new EIS was warranted, the court should not stop the lease sale because subsequent approvals were required before actual drilling could occur. *Id.* at 952. Rejecting this argument, Judge Breyer recognized that once the sale had occurred the agencies and the high bidders would become committed to the sale. The oil companies would spend time and money planning for lease development, and BLM would base its future actions on the issued leases. Each of these steps "represents a link in a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues." *Id.* Therefore, while requiring a new EIS even after the sale might "bring about a *new* decision . . . it is that much less likely to bring about a *different* one." *Id.* (emphasis in original). For this reason, the court enjoined the lease sale. *Id.* at 953; *see also Mass. v. Clark*, 594 F. Supp. 1373, 1388 (D. Mass. 1984) ("It is clear, therefore, that the law of this Circuit is that a mere sale of leases can constitute irreparable harm if the sale does not comply with NEPA requirements."); *California v. Watt*, No. 81-2080 (C.D. Cal. May 29, 1981) (Order granting preliminary injunction to stop off-shore mineral lease sale) (attached as Exh. 55).

The D.C. Circuit has long agreed with Judge Breyer's approach—recognizing that

allowing a project to go forward without adequate NEPA compliance creates the risk of "irreversible momentum."  *Jones v. District of Columbia Redevelopment Land Agency*, 499 F.2d 502, 511 (D.C. Cir. 1974) (emphasis added).  Indeed, the "more time and resources [the agency is] allowed to invest in this project, the greater becomes the likelihood that compliance with . . . NEPA, and the reconsideration of the project . . . will prove to be merely an empty gesture."  *Realty Income Trust v. Eckerd*, 564 F.2d 447, 456 (D.C. Cir. 1977) (quoting *Environmental Defense Fund v. Tenn. Val. Auth.*, 468 F.2d 1164, 1183-84 (6th Cir. 1972)); *Fund for Animals v. Espy*, 814 F. Supp. 142, 151 n.10 (D.D.C. 1993) (holding a preliminary injunction was necessary to prevent the proposed action from becoming a "fait accompli").[25]  Even if the agency does not ultimately change direction after new NEPA analysis, "[i]t is this *possibility* that the courts should seek to preserve" through injunctive relief.  *Jones*, 499 F.2d at 512-13 (emphasis added).

Furthermore, as Judge Breyer explained six years after *Massachusetts v. Watt*, the "irreparable harm" caused by a flawed NEPA process is "harm to the environment, not merely to a legalistic 'procedure.'"  *Sierra Club v. Marsh*, 872 F.2d at 504.  Failure to comply with NEPA creates a risk that "real environmental harm will occur through inadequate foresight and deliberation."  *Id.*; *see also Davis*, 302 F.3d at 1114 ("In mandating compliance with NEPA's procedural requirements as a means of safeguarding against environmental harms, Congress has presumptively determined that the failure to comply with NEPA has detrimental consequences for the environment.").  Accordingly, the "difficulty of stopping a bureaucratic steam roller, once started . . . [is] a perfectly

---

[25] Other Circuits also agree with Judge Breyer's approach.  *See, e.g., Davis v. Mineta,* 302 F.3d 1104, 1115 & 1115 n.7 (10th Cir. 2002) (recognizing the difficulty of stopping a "bureaucratic streamroller"); *Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988) ("Bureaucratic rationalization and bureaucratic momentum are real dangers, to be anticipated and avoided by the Secretary.").

proper factor for a district court to take into account . . . on a motion for a preliminary injunction." *Sierra Club v. Marsh*, 872 F.2d at 504.[26]

The irreparable bureaucratic steamroller identified by Judge Breyer in *Massachusetts v. Watt* is also present in this case. Once BLM issues the leases, the pressure to stick with that decision will mount. The companies will start expending resources to develop seismic and drilling plans. The money paid for the lease will be placed in the federal treasury with 50% distributed to the state of Utah. 30 U.S.C. § 191. Once the money is distributed, it could be difficult to retrieve. Additionally, if BLM is forced to reconsider its decision, the agency would be reluctant to change its mind for fear it could be subjected to industry claims of taking. *See, e.g., Mosely v. U.S.*, 15 Cl. Ct. 193 (Cl. Ct. 1988) (takings claim brought by lessee where BLM canceled a mineral lease); *Connor*, 848 F.2d at 1461 (suggesting that lessees "may have claims for damages against the government" under some circumstances). For these reasons, the lack of an injunction will, as a practical matter, make it more difficult for BLM to choose some other course of action if Plaintiffs are successful on the merits.

Likewise, allowing the lessees to proceed with plans for development may limit the remedies available to Plaintiffs at the end of the case. A number of courts, including the D.C. Circuit, have refused to void leases at the end of a case despite finding legal violations due to concern about "minimum imposition on the rights of lessees." *Alaska v. Andrus*, 580 F.2d 465, 485-86 (D.C. Cir. 1978), *overruled on other grounds by Western Oil & Gas Ass'n v. Alaska*, 439 U.S. 922 (1978); *see also Connor*, 848 F.2d at 1461

---

[26] The NHPA, like NEPA, is a "stop, look, and listen" statute that requires federal agencies to consider the effects of their actions on historic properties and sacred sites *before* implementation. 16 U.S.C. § 470f; *see also Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999). Accordingly, the risk of the bureaucratic steamroller is equally present for a NHPA violation.

(declining to void leases); *Wilderness Society v. Wisely*, 524 F. Supp. 2d 1285, 1306 n.12 (D. Colo. 2007) (declining to void leases because it might "adversely affect property interests obtained by lessees as a result of the lease sale").  Enjoining the leases now will allow BLM to reconsider its decision, unfettered by bureaucratic momentum, and ensure that Plaintiffs have all remedies available to them if they prevail on the merits.

## V.   THE IRREPARABLE HARM TO PLAINTIFFS OUTWEIGHS ANY POTENTIAL HARM TO DEFENDANTS.

In contrast to the irreparable harms described above, the federal government and the potential lessees will suffer little or no harm from maintaining the status quo while the case is decided.

This is an administrative record review case that likely will be resolved in a relatively short time period without extensive discovery or a trial.  *See, e.g.*, 5 U.S.C. § 706 (stating the Court's review in APA cases is based on the "whole record" produced by the agency).  Accordingly, neither BLM nor the potential bidders will suffer harm from delay of the lease sale.  BLM has no legal or cognizable interest in allowing *immediate* development of these leases.  The agency holds lease sales quarterly, *see* 43 C.F.R. § 3120.1-2, and could easily include these leases in a subsequent sale if Plaintiffs do not prevail on the merits.  Nor will the bidders at the December 19, 2008 auction suffer any significant harm.  At this point, they have no property or contractual rights in these leases.  The lease transaction has not been completed pursuant to the December 18, 2008, joint stipulation filed with this court.  Furthermore, if Plaintiffs do not prevail, BLM can issue the leases and the companies will be able to proceed promptly with their development plans.  By maintaining this status quo while it considers the merits of this decision, the Court will not impair any legal rights.

**VI.     A PRELIMINARY INJUNCTION WOULD SERVE THE PUBLIC INTEREST.**

A preliminary injunction will serve the public interest.  The public has a strong

interest in "preservation of the natural environment" and in protecting its public lands.

*National Wildlife Fed. v. Andrus*, 440 F. Supp. 1245, 1256 (D.D.C. 1977); *see also Earth*

*Island Inst. v. Forest Serv.*, 442 F.3d 1147, 1177 (9th Cir. 2006); *Wyoming Outdoor*

*Coordinating Council v. Butz*, 484 F.2d 1244, 1250 (10th Cir. 1973).  This interest is

particularly strong in this case where the impacts of development will be felt in some of

the nation's most prized national parks and public lands recognized for their wilderness

quality and abundance of cultural artifacts.

Likewise, there is a "strong public interest in meticulous compliance with the law

by public officials."  *Fund for Animals v. Espy*, 814 F. Supp. at 152; *see Greater*

*Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 163 (D.D.C. 2002) ("Courts have

not hesitated to enjoin an agency action that was taken in violation of NEPA.").  A

preliminary injunction in this case would ensure that BLM complies with NEPA and the

NHPA as Congress intended by taking into account the tremendous environmental and

cultural impacts of oil and gas development on these sensitive lands before proceeding

with the sale.  Exh. 55 at 3 ("[T]he public interest is furthered by enjoining the leasing of

the challenged tracts because of the public's significant interest in effectuating . . .

Congressional intent."); *Citizen's Alert Regarding the Environment v. U.S. Dep't of*

*Justice*, 1995 WL 748246, at *12 (D.D.C. 1995) ("Issuance of a preliminary injunction

here would thus directly serve the public interest by ensuring that federal agencies

thoroughly consider the environmental consequences of their actions as mandated by

NEPA."); *Fund for Animals v. Espy*, 814 F. Supp. at 152 ("[A] public interest expressed

43

by Congress was frustrated by approval of this proposal . . . without NEPA compliance.").

On the other side of the scale, a preliminary injunction will not harm the public. At most, such an injunction may delay initial oil and gas development on these lands for a short time. The small number of wells that might be drilled during the relatively short time that this case is being litigated would only supply a miniscule percentage of the overall regional and national production and therefore will have little or no impact on energy prices or supply. *See Mass v. Watt*, 716 F.2d at 953 (finding the integrity of the NEPA process outweighed any short delay in oil production). Indeed, there is no shortage of public land nationwide that is currently under lease, but undeveloped, that could be developed while this case is proceeding. According to Department of Interior records available through fiscal year 2007, there are more than 44 million acres of BLM-managed minerals currently under lease, but less than 12 million acres in production. House Appropriations Subcommittee on Interior, Environment, and Related Agencies: Written responses from Secretary Dirk Kempthorne to questions submitted for the hearing record by Rep. Maurice Hinchey, oversight hearing on the FY 2008 Department of the Interior budget proposal (March 1, 2007) at 4, 12 (attached as Exh. 56).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enjoin BLM from issuing the 80 oil and gas leases at issue in this case.

Dated: December 22, 2008                    Respectfully submitted,

      /s/Sharon Buccino
Sharon Buccino (D.C. Bar # 432073)
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
(202) 289-6868

Stephen H.M. Bloch (UT Bar #7813)
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161

Robin Cooley (CO Bar. #31168)
Earthjustice
1400 Glenarm Place #300
Denver, CO 80202
(303) 263-2472